(No. 47321

*In re* ADOPTION OF NICOLE LEIGH HOFFMAN, a minor.—(Rose Allen Hoffman *et al.*, Appellants, v. Bernard Allen Hoffman *et al.*, Appellees.)

*Opinion filed Sept. 26, 1975.—Rehearing denied Nov. 21, 1975.*

Thomson, Thomson, Zanoni & Flynn, of Bloomington (Chester Thomson and Mike McElvain, of counsel), for appellants.

Samuels, Miller, Schroeder, Jackson & Sly, of Decatur (William O. Martin, Jr., of counsel), for appellees.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

This is a proceeding under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 72) brought by the natural parents of a minor child to vacate a decree of adoption entered in the circuit court of De Witt County in favor of the adopted child's paternal grandparents. The petitioners alleged that consents to the adoption of their daughter had been obtained from them on the basis of fraudulent misrepresentations made by the grandparents. The trial court denied the petition on the grounds that the natural parents had failed to sustain their burden of proof; on appeal, the Appellate Court for the Fourth Judicial District reversed and remanded with

directions to grant the petition to vacate the decree (*Hoffman v. Hoffman* (1974), 24 Ill. App. 3d 543), and we allowed leave to appeal.

The natural parents, Bernard and Susan Hoffman, were married on December 5, 1969, at which time Bernard was 19 and serving in the United States Navy while Susan was 16 and attending high school. Their daughter, Nicole Leigh, was born on June 13, 1970. Shortly thereafter, Susan moved with the infant from the home of her parents to the home of the paternal grandparents, Robert and Rose Hoffman. Bernard joined his wife and daughter in his parents' home in September of 1970 after his honorable discharge from the Navy.

During the ensuing months, Bernard had a succession of jobs and was unable to maintain steady employment. He regularly remained out very late at night with friends and took Susan with him several nights a week. Susan was also away during the day attending school. As a consequence, the child was often left with the grandparents, who assumed what appears to have been an increasingly major role in the care and support of the child. Bernard and Susan experienced marital discord during this period, and a divorce was contemplated by Bernard.

The matter of adoption of the child by the grandparents was discussed by the natural parents and the grandparents on various occasions commencing in February, 1971, according to Rose Hoffman and in May or June, 1971, according to Bernard and Susan. The nature of these discussions and the circumstances under which they took place is disputed as will be related later. The end result, however, was a decision by both the natural parents and the grandparents to go forward with the adoption.

On July 1, 1971, Bernard and Susan went to the offices of an attorney who had been retained by the grandparents to handle the adoption proceeding. The attorney discussed with them the consequences of their consenting to the adoption of the child by the grand-

parents and informed them that they would be giving up all legal rights to the child. They then proceeded with the attorney to the chambers of Judge William C. Calvin, who also explained to them in detail the legal consequences of signing consents to adoption. It is conceded that the judge told them that irrespective of whatever arrangements they thought they had with Robert and Rose Hoffman concerning their future relationship with the child, any consents to adoption they signed would be irrevocable, and the consequences would be their absolute relinquishment of all parental and legal rights to the child. Bernard and Susan then signed the consents before Judge Calvin, who executed his certification that each of them acknowledged the consents to be free and voluntary acts; that he had explained that by signing such consents they had irrevocably relinquished all parental rights to the child; and that they had stated that such was their intention and desire. At the time the consents were signed, Bernard was 20 years of age and Susan was 17. On July 30, 1971, a decree of adoption was entered following a hearing at which the minor child was represented by a guardian *ad litem*.

After the entry of the adoption decree, Bernard and Susan continued to reside with Bernard's parents as if nothing had occurred affecting their parental relationship with the child. Late in September, 1972, they purchased a trailer, and when they attempted to take Nicole with them the grandparents refused to permit her to be removed from their residence.

On July 23, 1973, Bernard and Susan filed their section 72 petition requesting that the decree of adoption entered approximately 2 years earlier be vacated. The petition included allegations that when they signed the consents to adoption they had relied on the false representations of Rose Hoffman that the child would not be removed from their custody and that the purpose of the adoption was to provide for custody of the minor if they were both killed in an automobile collision; that as to

Bernard it had also been represented to him by his mother that an additional purpose of the adoption was to terminate the parental rights of Susan Hoffman and vest them in the grandparents in the event Bernard and Susan should subsequently become divorced; and that the consents were obtained in violation of section 11 of the Adoption Act (Ill. Rev. Stat. 1971, ch. 4, par. 9.1–11). In an amended petition it was additionally alleged that the consents to adoption were obtained without due process of law in that the natural parents were not afforded legal representation either prior to or on the date they executed the consents to adoption.

At the time of the hearing on the section 72 petition on October 2, 1973, the child had remained in continuous residence with the grandparents for a period of over 3 years since shortly after birth. At the hearing, the natural parents attempted to show that they were responsible, dutiful parents who loved their daughter and were deeply concerned about what would happen to her in the event of their untimely demise in an automobile accident; that they placed great trust and confidence in Robert and Rose Hoffman and followed their advice that it was the best thing to do to permit them to adopt the child; that they believed adoption was the only means of providing for the child in the event of their death; and that notwithstanding the admonitions by Judge Calvin to the contrary they were confident that Bernard's parents would never deprive them of the care and custody of their daughter following the adoption.

The evidence on behalf of the grandparents indicated that Bernard and Susan took little interest in the child and were away much of the time leaving the child in their care; that the natural parents had failed in the performance of their responsibilities as parents and contributed very little to the support of the child; that they had agreed to adopt the child at the request of the natural parents; that they never indicated to Bernard and Susan in any manner that

they could have custody of the child following the adoption; and that they had very little rapport with their son, who would not listen to them or take their advice.

There was a decided conflict in the testimony as to who first brought up the subject of adoption and what was said. According to the natural parents, Rose Hoffman initiated the subject on numerous occasions and persistently urged her son and daughter-in-law to permit them to adopt the child so that she would be properly cared for in the event Bernard and Susan were killed in an automobile accident. They both stated that they inquired as to whether there was any other way to provide for the child in the event of such a contingency, but that after checking into the matter Rose Hoffman told them there was no alternative. They stated that if they had known there was another method they never would have consented to the adoption. Bernard also testified that his mother suggested the adoption for the additional reason that if he and Susan should be divorced their daughter would remain on the Hoffman side of the family. They each testified that while they at first did not want to give up their child they finally changed their mind when Bernard's mother said that if they really loved the child they would set aside their personal feelings and go ahead with the adoption, which would be best for the child. On cross-examination each of them conceded that they knew Bernard's parents would care for the child if something happened to them no matter what course of action they decided to follow. Bernard also admitted that his father was against the adoption and wanted him to keep the child during the early stages of their discussion of the matter.

There was no testimony by Bernard that his parents had ever told him specifically that he and Susan could retain custody of the child after the adoption. Susan, however, indicated in her testimony that it was her understanding that Bernard had been told by his mother that even though they would be giving up legal custody,

they would still retain physical custody and everything would stay the same as before the adoption. There was some indication that the purpose of the adoption may have been mentioned by the natural parents in Judge Calvin's chambers. Bernard testified that the judge had said the purpose of the adoption was beside the point and that "your parents could turn around and stab you in the back if they wanted to." It seems clear that both Bernard and Susan understood that, legally, the grandparents could do whatever they wished with the child following the adoption.

Robert and Rose Hoffman each testified that Bernard and Susan asked them to adopt their child and were the ones who at various times initiated discussions about the proposed adoption. Each time the matter was brought up, Robert Hoffman expressed hesitation about the proposal and indicated that they would have to wait and see. He also inquired of them whether they were sure they wanted to proceed in this manner, to which Bernard and Susan replied affirmatively on each occasion. The grandparents testified further that they never suggested in any manner that Bernard and Susan could retain physical custody of the child after the adoption and that they never said that an adoption was desirable to provide for the child in the event Bernard and Susan should be killed in an automobile accident. Rose Hoffman testified that the only time there was any discussion about an accident was when Susan expressed concern over what people would think about her giving up her child for adoption and requested that the grandparents, if anyone should ask them about it, say as an excuse that it was to provide for the child in case of an accident.

The attorney who represented Robert and Rose Hoffman in the adoption proceedings testified that he explained to Bernard and Susan that if they signed the consents the adoption would be absolute and final. He also referred to the admonishments given by Judge Calvin as

being very thorough and recalled that the judge had explained to them that the grandparents would become the legal parents of the child even if they continued to live in the family home. It was his general opinion from conversations with both the grandparents and natural parents that the purpose of the adoption was the natural parents' desire to be relieved of responsibility for the child.

Jesse Hammer, a friend of Bernard's, testified that on one occasion he was present at a family gathering in the Hoffman residence and overheard Rose Hoffman tell Bernard and Susan that they could have the child back when they settled down. As previously indicated, Rose Hoffman denied making any such statement at any time. Mrs. Nick Hoffman, who was Bernard's paternal grandmother, testified that on one occasion when she told Rose Hoffman that she was getting too attached to the baby and that it would be hard to give her up, Rose Hoffman replied that Bernard and Susan would never get the baby back. It was brought out on cross-examination that the witness disliked her daughter-in-law, Rose Hoffman, and was very close to her grandson, Bernard.

A sister of Robert Hoffman indicated that she had observed Susan and Rose Hoffman with the baby on several occasions over a 2-year period which led her to conclude that Rose Hoffman was taking too great an interest in the baby. She also testified that when she asked Susan if she wouldn't like to do more to help take care of the baby, Susan replied that she did not have much of a chance.

There was testimony that while Susan took care of the child on some occasions when she was home, the grandparents, and particularly Rose Hoffman, performed most of those duties. Susan acknowledged that she was permitted to take care of her child all she wished to and did in fact perform some parental duties every day. However, Rose Hoffman's testimony that she fixed all the meals and fed, bathed, did the laundry for the child and put her to

bed at night most of the time is largely uncontradicted.

The grandparents testified that their son and daughter-in-law contributed a total of only $80 to the support of Nicole during the period of over 2 years they lived in the Hoffman residence. Bernard stated to the contrary that he and his wife each contributed $7.50 per week to the support of the child and that during those periods when he was not working he would borrow funds for this purpose from his parents. Robert Hoffman testified he had never heard about any payments by his son and daughter-in-law of $7.50 per week for support and that he gave his son spending money of at least $5 to $10 each week which he did not keep a record of. There is also evidence that Bernard had borrowed funds for unspecified purposes from his parents. Rose Hoffman testified that she had purchased almost all of the child's clothing.

Robert Hoffman related that he had trouble communicating with Bernard, who would not listen to him, and that on one occasion his son had refused to work for him. Rose Hoffman testified as to her feeling of indifference toward her daughter-in-law.

The trial court denied the petition to vacate the decree of adoption for the reason that the petitioners had failed to sustain their burden of proof. The appellate court reversed upon a finding that the grandparents owed the natural parents a fiduciary duty which was breached in an effort to gain custody of the child through a course of conduct amounting to fraud. We disagree with the appellate court's conclusion that the trial court's finding to the contrary was against the manifest weight of the evidence.

Section 11 of the Adoption Act provides in pertinent part that "[a] consent to adoption by a parent, including a minor, executed and acknowledged in accordance with the provisions of Section 8 of this Act *** shall be irrevocable unless it shall have been obtained by fraud or duress and a court of competent jurisdiction shall so find. The consent of a parent who is a minor shall not be voidable because of

such minority." (Ill. Rev. Stat. 1971, ch. 4, par. 9.1—11.) This section clearly reflects a legislative recognition of the public policy favoring the finality and stability of adoptions. (*People ex rel. Drury v. Catholic Home Bureau* (1966), 34 Ill.2d 84, 93-94.) The burden of proving fraud or duress rests upon the party challenging the validity of the consent, and the findings of a trial court as to this issue may not be set aside on appeal unless contrary to the manifest weight of the evidence. (*Drury.*) It is not contended that the consents were executed under duress, thus leaving as the sole issue the question whether the determination of the trial court that the natural parents had failed to sustain their burden of proof, which must include proof of fraud, is contrary to the manifest weight of the evidence.

As a general proposition, "Fraud includes anything calculated to deceive, whether it be a single act or combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence ***." (*People ex rel. Chicago Bar Association v. Gilmore* (1931), 345 Ill. 28, 46.) "The concept of fraud 'implies a wrongful intent—an act calculated to deceive.' " (*Exline v. Weldon* (1974), 57 Ill.2d 105, 110.) We have also observed that "A misrepresentation in order to constitute a fraud must consist of a statement of material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on the truth of the statement." *Roth v. Roth* (1970), 45 Ill.2d 19, 23.

The natural parents' theory of fraud in this case is that the grandparents misrepresented the purpose and necessity for the adoption and led them to conclude that they could retain physical custody of the child notwithstanding the adoption. As indicated above, there was substantial conflict in the testimony concerning the nature and content of the discussions between the grandparents and the natural

parents which preceded the signing of the consents to adoption. The matter of credibility of the witnesses was of major importance and is best determined by the trier of fact. Our review of the record leads us to conclude that this question could well have been resolved, as it apparently was, in favor of the grandparents. Considerable weight must be afforded not only to the uncontradicted testimony concerning the admonishments given by the attorney and Judge Calvin, but also to Judge Calvin's certification that after a full explanation the natural parents had acknowledged that it was their intention and desire to irrevocably relinquish all parental rights to the child. It is particularly significant that Judge Calvin specifically warned the natural parents that they could not rely on any understandings they might have had with the grandparents as to their parental rights following the adoption. There is no indication that due to incompetency or any other cause the natural parents were unable to comprehend this admonition. To the contrary, the record indicates that they could and did understand the admonition but chose to ignore it. We therefore conclude that the finding of the trial court that petitioners failed to sustain their burden of proof is not against the manifest weight of the evidence, and the judgment of the appellate court to the contrary must be reversed.

This brings us to the contention urged by the natural parents that their signing of the consents to adoption without the advice of counsel constituted a violation of the equal protection and due process clauses of the United States and Illinois constitutions. They have cited no authorities which so hold, and we are not persuaded that there is merit to this contention. While it may be desirable for the natural parents of a child to have legal counsel prior to consenting to the adoption of the child, we do not find it to be constitutionally required, particularly in view of the safeguards contained in section 8 of the Adoption Act, which specifies the form of the consent (Ill. Rev. Stat.

1971, ch. 4, par. 9.1—8), and section 10(F), which requires all consents of this type to be acknowledged by a parent before a judge or other person designated or approved by the court. Ill. Rev. Stat. 1971, ch. 4, par. 9.1—10(F).

Accordingly, the judgment of the appellate court is reversed and that of the trial court affirmed.

*Appellate court reversed;*
*circuit court affirmed.*