LINDA FAY REGENOLD, Petitioner-Appellee, *v.* THE BABY FOLD, INC., Respondent-Appellant.—(RICHARD RILEY *et al.*, Intervenors-Appellants.)

Fourth District   No. 13704

Opinion filed September 30, 1976.

TRAPP, P. J., dissenting.

Yoder, Yoder, Luedtke & Hartweg, of Bloomington, for appellants Richard Riley and Priscilla Riley.

DePew, Grimes & Chesley, of Bloomington, for appellant Baby Fold, Inc.

Craig H. Greenwood, of Bloomington, for appellee.

Thomas A. Eckols, guardian ad litem, for Jason Regenold.

Mr. JUSTICE CRAVEN delivered the opinion of the court:

This is an appeal by the respondent, The Baby Fold, Inc. (Baby Fold), and the intervenors, Richard and Priscilla Riley, of an order entered by the circuit court of McLean County after a hearing on a habeas corpus petition filed by Linda Fay Regenold, the natural mother of Jason Regenold, a minor. The trial court found that petitioner was entitled to custody and control of the child, and ordered intervenors to return the child to petitioner. This court has stayed the trial court's order pending a decision on appeal.

On October 20, 1975, petitioner, a 19-year-old mother who had been divorced on September 23, 1975, contacted and visited The Baby Fold, a child welfare agency, relative to her infant son, Jason (born August 2, 1974). On October 22, 1975, petitioner returned to Baby Fold with her son, signed what is entitled "Final and Irrevocable Surrender For Purposes of Adoption" and surrendered custody of her son to a worker of Baby Fold. On October 24, 1975, petitioner again visited Baby Fold, was informed of the placement, and gave certain medical history information

about the child to the staff at Baby Fold. On October 26, 1975, petitioner visited a married couple who had known her since birth, and sought their aid in procuring the return of her child. By October 28, 1975, an attorney representing petitioner had contacted Baby Fold seeking the return of the child. On December 1, 1975, petitioner filed a petition for a writ of habeas corpus. A hearing was conducted January 26, 1976, after which, on February 13, 1976, the trial court invalidated petitioner's surrender and consent to adoption, and ordered the child returned to petitioner.

The facts are in dispute as to the reason petitioner contacted Baby Fold. Petitioner testified that she wanted to talk to someone. She introduced evidence indicating that she was living under a great deal of stress at the time of placement; she was a 19-year-old mother who had then been divorced for one month; her husband had communicated to her through various letters indicating that he was unable to accept the finality of their divorce; her parents, with whom she lived, constantly argued; her mother was divorcing her father, and intended to force petitioner and her child out of the home; she had to adjust to the responsibility of a new position at her job; she had conflicts with her mother over the responsibility of rearing her three-year-old brother; the brother was a threat to her son's physical well-being; she faced various financial difficulties; she was under medication and feared that she faced a partial hysterectomy if the medication was ineffective. Psychiatric testimony was introduced which concluded that petitioner was suffering from severe stress and "transient situational disturbance." Petitioner's position is that Baby Fold brought up the subject of adoption as a solution to her problem, and that due to the severe emotional duress under which she was living and of which Baby Fold was aware, Baby Fold's hasty actions in accepting her surrender without exploring other solutions constituted fraud or duress which invalidated her surrender.

Baby Fold's position is that it did nothing out of the ordinary, and that petitioner contacted Baby Fold for the purposes of surrendering her child. Baby Fold introduced evidence indicating that the procedure it followed is not unusual. Plaintiff was counseled on Monday, October 20, 1975, at which time she filled out and signed a family history form. A witness for Baby Fold testified that, at that time, the alternatives of short term foster care or permanent adoption were discussed. Petitioner was asked during the October 20, 1975, interview if she wanted to consider her action and someone "suggested Wednesday." Exactly what was meant by "suggested Wednesday" is unclear from the record, but apparently the phrase referred to the date of surrender of the child. On Wednesday, the surrender papers were signed and the child was surrendered. The surrender form was read to the petitioner before she signed it.

On the basis of the evidence, the trial court invalidated petitioner's surrender stating:

> "The court finds, in the circumstances present in this case, that the surrender is invalid in that it was not executed as the free and voluntary act of the petitioner.
>
> The execution of the surrender was a reaction to the severe environmental stress and pressure under which the petitioner was operating. Her action in signing the surrender was neither voluntary or understanding. There is no doubt that, in the circumstances present here, the petitioner was not exercising her own free will in signing the surrender. The emotional disturbance that she was experiencing and the evironmental stress and pressure upon her combined to produce a result which was the product of duress."

Besides the problems facing petitioner as enumerated above, the trial court observed and found that Baby Fold:

> "[B]y failing to make meaningful attempts to solve the petitioner's problems; by acting with unseemly haste in taking the surrender, and by accepting a surrender from someone subject to the assorted pressures facing petitioner thereby became a subtle, but active participant in the chain of events which denied the petitioner the exercise of her free will and deprived her of her infant son."

Respondent appeals, contending that the decision of the trial court is contrary to the manifest weight of the evidence. Section 11 of the Adoption Act was amended in 1973 to provide in pertinent part:

> "A consent * * * shall be irrevocable unless it shall have been obtained by fraud or duress on the part of the person before whom such consent, surrender, or other document equivalent to a surrender is acknowledged* * *." (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—11.)

Petitioner persuasively argues that section 11 is constitutionally void under due process and equal protection standards in that it legislatively precludes invalidation of actions performed under duress, depending on the source of the duress. We note that the trial court, by its findings, clearly invited a comprehensive review of the statute as amended. Although we entertain serious doubts as to the constitutional validity of the statute, we need not resolve that issue. We conclude that the stress petitioner has established, regardless of its source, as a matter of law does not amount to the duress which is necessary to vitiate her consent.

■■■ Duress, in the context of consent for adoption, has been defined in numerous decisions. This court's most recent statement on the subject can be found in *In re Sims* (1975), 30 Ill. App. 3d 406, 332 N.E.2d 36, incorporating previous supreme court pronouncements:

" ' * * *:

"Duress has been universally defined as a condition which exists where one is induced by the unlawful act of another to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will. There must be such compulsion affecting the mind as shows that the execution of the contract or other instrument was not the voluntary act of the maker. Such compulsion must be present and operate at the time the instrument was executed. The burden of proving such duress is on the person asserting it. [Citations.]

Mere annoyance or vexation will not constitute duress, but there must be such compulsion affecting the mind as shows that the execution of the contract or other instrument is not the voluntary act of the maker. [Citations.]" 'Mere advice, argument or persuasion does not constitute duress or undue influence if the individual acts freely when he executed the questioned documents though the same would not have been executed except for the advice, argument or persuasion. [Citation.]' " 30 Ill. App. 3d 406, 410-411, 332 N.E.2d 36, 39-40.

■■ Moreover, whether the stress under which an individual acts amounts to the duress necessary to invalidate a consent for adoption must be determined in the context of the public policy favoring finality in the adoption process. We note that the Adoption Act's consent provision has evolved over the years in response to the recognized need for providing a stable and secure environment for the adopted child (*In re Wojtkowiak* (1957), 14 Ill. App. 2d 344, 144 N.E.2d 760), and to protect the parties from the complex psychological problems inherent in permitting a natural parent to withdraw consent. (*People ex rel. Drury v. Catholic Home Bureau* (1966), 34 Ill. 2d 84, 213 N.E.2d 507; *In re Adoption of Hoffman* (1975), 61 Ill. 2d 569, 338 N.E.2d 862.) In *Drury,* the Illinois Supreme Court noted:

"Admittedly, a mother's decision to consent to her child's adoption by a couple to her unknown must be a most difficult one to make. Strong emotional factors militate against it. Once done, misgivings not only may occur, but are probable, and it is not unlikely that attempts to rescind such consent will be made at a time when the child has been placed in an adoptive home, and new attachments formed." (34 Ill. 2d 84, 93-94, 213 N.E.2d 507, 512.)

Our legislature has balanced the needs of the adoption system against the natural inclinations of consenting parents and concluded that such consent is irrevocable in the absence of fraud or duress. We are compelled to enforce such policy, and where the evidence fails to establish fraud or duress, the consent must be given effect.

██ The record before us reflects a young mother of normal intelligence and normal emotional development. The record also reflects a number of disturbing and vexing problems which she faced. The record is devoid, however, of any evidence suggesting that petitioner's consent was the product of third-party persuasion, inducement, deception, or domination. In *Sims,* this court found duress under conditions quite dissimilar to the instant case. In *Sims,* the compulsion to consent to adoption was in the form of a specific mandate. There the natural mother's parents "conditioned their parental love of their daughter and their fulfillment of their legal obligation to support her during her minority on her consenting to the adoption." (30 Ill. App. 3d 406, 411, 332 N.E.2d 36, 40.) The instant record demonstrates, at most, that the possibility of adoption was suggested by an employee of Baby Fold after petitioner, on her own initiative, contacted and visited Baby Fold's place of business. In *In re Petition of Huebert* (1971), 132 Ill. App. 2d 793, 270 N.E.2d 464, duress was found where adoption had been suggested to the mother by a close friend who had become involved with the mother's husband and who was able to exert undue influence and control over her. There the natural mother's consent was taken during one brief interview at the Department of Public Aid. We agree with the *Huebert* court and the trial court below that the time period within which the respective consents to adoptions were effected constituted unseemly haste. We are critical of that kind of procedure in such a sensitive area. We encourage the legislature to establish standards commensurate with the importance of the decision involved. We must hold, however, that as a matter of law, mere haste coupled with environmental stress does not constitute duress. Upon the record before us we cannot conclude that petitioner's actions were performed under duress as heretofore defined. Accordingly, we hold that the findings of the trial court were contrary to the manifest weight of the evidence.

The judgment of the circuit court of McLean County is reversed.

Reversed.

SIMKINS, J., concurs.

Mr. PRESIDING JUSTICE TRAPP, dissenting:

I would affirm the order of the trial court. The trial court made the finding:

> "The facts are in dispute as to whether the petitioner was seeking help and advice in providing proper care for her son, or whether she contacted Baby Fold with the plan of placing him for adoption."

In such context this record shows consummation of the surrender with extraordinary speed. There was an initial interview of approximately two hours on the evening of October 20. On the morning of October 21, respondent called a staff meeting at which the adoptive home was chosen. The reasonable conclusion is that the adopting parents accepted the child without any introduction, for that home was described to petitioner on the evening of October 23, when the surrender was executed. The child was delivered to the adopting parents on the 24th.

So far as the record shows, the child's father was believed to be in California at the time that the child was placed without seeking his consent and that the adopting parents were told that his parental rights would have to be terminated by them in subsequent legal proceedings. It is an apparently fair inference that the respondent concluded that the adoption was deemed to have been finally determined upon at the interview on October 20.

This is in marked contrast to the facts in the opinions of the Supreme Court which have been cited. In *People ex rel. Drury v. Catholic Home Bureau* (1966), 34 Ill. 2d 84, 213 N.E.2d 507 (habeas corpus), the record shows that the consenting mother had discussed adoption with her parents, her fiance and one or more doctors and psychiatrists during a period between December, 1963, and June, 1964. The court found from the record that the consenting mother was thoroughly informed as to alternative methods of providing immediate care for the child and that the legal effect of adoption was explained to her in details on two separate occasions. Hence, the court held that the finding of the trial court that the consent was a free and voluntary act was not contrary to the manifest weight of the evidence.

Again, in *In re Adoption of Hoffman* (1975), 61 Ill. 2d 569, 338 N.E.2d 862 (Civil Practive Act, section 72), the record showed that the parents had discussed the proposed adoption during a period extending from February into July, and it is of great significance that the consequences of the consent to the adoption were fully explained by the judge before whom the consents were executed.

Petitioner argues that the representatives of respondent who interviewed petitioner on October 20, incorrectly interpreted the latter's intentions at such interview. We have noted the court's finding in such regard. Petitioner further points out that such representatives on that date incorrectly interpreted a response of petitioner to mean that she had considered surrendering the child for adoption for some six months. The record shows that following petitioner's detailing of her financial problems, one representative said to petitioner, "So this has been a problem on your mind for quite a while," to which petitioner responded "Yes," and in a further response said she had been thinking of it for six

months. Respondent's witness agreed on cross-examination that such response, together with the disputed interpretation of a telephone call, were the basis for a conclusion that petitioner intended to give the child in adoption at the interview on October 20. Consideration of the record discloses that the trial court might have properly concluded that the period of six months mentioned was not meant as a reference to petitioner's consideration of adoption, but rather to the period of her concern over her financial difficulties.

There is evidence in behalf of the respondent that the mother was told on several occasions that the surrender of the child was irrevocable and that the surrender document was read to petitioner before she signed it. Section 13 of "An Act in relation to the adoption of persons* * *" (Ill. Rev. Stat. 1973, ch. 4, par. 9.1—13(A)(a)), makes the execution of a statutory consent but prima facie evidence of the validity of such consent. It is a fair conclusion that the petitioner was not on an equal footing with the respondent's representatives in considering the meaning of adoption and the consummation of the surrender. The record does not include any other testimony as to an explanation of alternatives in aid of petitioner's existing financial and personal problems, nor does there appear to have been any further explanation of the meaning of the termination of parental rights. It is significant that when petitioner discovered a source of aid in meeting her avalanche of problems there was a request for the return of the child made on October 28.

The courts have expressed concern with achieving stability and finality in adoption. This case, as with others, suggests the wisdom of a provisional surrender for a reasonable period. Upon such issue of stability this case cannot be measured by the tests of *Hoffman,* where the action to recover her child was commenced two years after the decree for adoption, or by that in *Catholic Home,* where a period of six months intervened between the surrender and the habeas corpus proceeding.

The petitioner raised the issue of due process and equal protection of the law under the Constitution in the trial court and here. The trial court found that:

> "The totality of the circumstances in this case prevented the petitioner from exercising her free will, and placed her under extreme duress thereby rendering the surrender invalid."

Upon such determination it was unnecessary for the trial court to make a constitutional determination. This court suggests substantial constitutional issues, but declines to consider such and reverses as a matter of law.

In *Stanley v. Illinois* (1972), 405 U.S. 645, 31 L. Ed. 2d 551, 92 S. Ct. 1208, the court stated that parental rights are essential and basic rights

entitled to the equal protection of the law and due process under the Constitution of the United States, saying:

> "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection." (405 U.S. 645, 651, 31 L. Ed. 2d 551, 558.)

Such language was approved and quoted in *Weinberger v. Wiesenfeld* (1975), 420 U.S. 636, 651, 43 L. Ed. 2d 514, 526, 95 S. Ct. 1225.

We submit that the interest of the mother in this proceeding "warrants deference" equally and that such interest is at least substantially equal in a constitutional sense to that of one charged with a criminal offense. By the rule of *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709, when one charged with a criminal offense enters a plea of guilty the record must show that the individual was informed concerning all of the several rights which he will surrender, and of the consequences incident to his plea to the end that it can be shown that the individual so acting has full understanding of the matters and acts in an intelligent and voluntary manner. To achieve such constitutional purpose Supreme Court Rules 401 and 402 require solemn judicial admonition of the several rights surrendered and of the consequences of the act.

*Hoffman* does not address the precise issue of the validity of a "surrender" to an "agency." That opinion had occasion to consider only the acknowledgment of a "consent" to an adoption executed before a circuit judge after he had admonished the parents concerning the nature and consequences of the adoption. The record in that case shows the extent of such admonition and that it indeed served as a source of independent counsel which is not clearly present in this case. It is clear that the court gave great weight to the judicial admonition.

The statute we consider makes the consent irrevocable in the absence of fraud or duress only on the part of one acknowledging the consent or an adopting parent. Fraud and duress are fundamentally concepts of contract or tort. As stated in *Stanley:*

> "It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.' " 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558.

While the courts have stated that the statute expresses desirable objectives, nonetheless:

> "The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes

48

higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials* * *."

Here, the trial court found that the surrender at issue was not an understanding voluntary act of the mother. The principal opinion does not determine that such judgment was contrary to the manifest weight of the evidence. It is submitted that in the context of due process and equal protection the judgment below should be affirmed.