(No. 50576.-

*In re* WILLIAM WORKMAN *et al.,* Minors
(Cynthia Gillion, Appellant).

*Opinion filed June 1, 1979.*

Patrick T. Murphy, of Goldberg & Murphy, of Chicago, for appellant.

Edward F. Petka, State's Attorney, of Joliet (William R. Ford, Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

This case arises under the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—1 *et seq.*). After extensive hearings in the circuit court of Will County, the court found that the appellant, Cynthia Gillion, had abandoned her two minor children and had failed to maintain a reasonable degree of interest, concern or responsibility for their welfare. Accordingly, pursuant to sections 1(D)(a) and 1(D)(b) of the Adoption Act (Ill. Rev. Stat. 1971, ch. 4, pars. 9.1—1(D)(a), (b)) the court held Cynthia to be unfit as a parent. Pursuant to section 5—9 of the Juvenile Court Act (Ill. Rev. Stat. 1971, ch. 37, par. 705—9), the court terminated her parental rights and appointed a guardian with the power to consent to the adoption of the two minors. (*In re Workman* (circuit court of Will County, April 5, 1973) No. W72F 372J, *appeal dismissed* (1975), 38 Ill. App. 3d 261 (*Workman* I) *appeal denied* (1976), 63

Ill. 2d 552; *cert. denied* (1977), 429 U.S. 1038, 50 L. Ed. 2d 749, 97 S. Ct. 734.) Cynthia concedes that she and her counsel were informed in open court, prior to the entry of the decree, that she would have 30 days within which to file an appeal. Cynthia (who had been represented at those hearings by counsel appointed pursuant to section 1—20 of the Juvenile Court Act (Ill. Rev. Stat. 1971, ch. 37, par. 701—20)), did not file a notice of appeal from the decision within 30 days, nor did she seek an extension of time, as provided for by Supreme Court Rule 303 (50 Ill. 2d R. 303). Sometime between April and October of 1973, however, Cynthia evidently "retained" the same attorney who had been appointed to represent her. The attorney filed a motion styled "Petition for Rehearing" based upon alleged changed circumstances. Such a "rehearing" did occur, at which time Cynthia assumed the burden of going forward with the proof of "changed circumstances," but failed to persuade the court. Cynthia's counsel then filed a notice of appeal from both the original finding of unfitness and its reaffirmation on rehearing.

On appeal, the appellate court dismissed the appeal from the 1973 finding, and affirmed the 1974 finding. (One justice, specially concurring, reasoned that the "rehearing" was improper, because the original finding of unfitness, once final (through failure to appeal), could not be reopened.) (*In re Workman* (1975), 38 Ill. App. 3d 261 (*Workman* I).) Cynthia then obtained new counsel, who filed a petition for leave to appeal to this court, which was denied (63 Ill. 2d 552) as was his petition for *certiorari* to United States Supreme Court (*sub nom. Gillion v. Illinois* (1977), 429 U.S. 1038, 50 L. Ed. 2d 749, 97 S. Ct. 734). Counsel then filed a new petition in the circuit court, styled "Amended Petition for a Report of the Guardian and for a Restoration of Parental Rights; a Petition for a Writ of Habeas Corpus; and a Petition pursuant to Section 72 of the Illinois Civil Practice Act." The petition argued

(1) that the best interests of the children favored their return to Cynthia and (2) that the 1973 order terminating Cynthia's parental rights was illegal because Cynthia was not advised of the right to assistance in appealing that order. The petition prayed for a new hearing, or, alternatively, leave to file a notice of appeal from the 1973 order "nunc pro tunc." The circuit court denied the petition, and the appellate court affirmed (*In re Workman* (1978), 56 Ill. App. 3d 1007 (*Workman* II)). Another justice, concurring in part and dissenting in part, urged this court to review the decision to determine whether, once all parental rights have been terminated, a petition for restoration of those rights will lie. We granted leave to appeal, but on oral argument in this court Cynthia's counsel expressly conceded all issues except that of whether, at the time of its 1973 order, the trial court's failure to inquire into Cynthia's indigency and offer her some type of assistance on appeal denied her constitutional rights in such a way as to require a reopening of these proceedings, and possible modification of the order entered in 1973. We need not, however, decide that issue here. See generally, *e.g.*, Annot., 80 A.L.R.3d 1141, 1153-54 (1977). But *cf.* generally *In re Adoption of Hoffman* (1975), 61 Ill. 2d 569, 579 (particularly in view of safeguards in the Adoption Act, neither due process nor equal protection required that natural parents be afforded legal counsel prior to consenting to adoption).

We have reviewed the record which led to the 1973 order terminating Cynthia's parental rights, and we find that order to have been more than amply supported. Cynthia and Robert Workman were married in July 1967. In January of the following year, Robert entered the army, and in September of that year, Robert was sent to Vietnam. The next month a son, Robert, Jr., was born to the Workmans. In June or July of 1969 Robert, Sr., returned from Vietnam to Ft. Sheridan, Illinois, where he

applied for a hardship discharge from the army. He received such a discharge in August 1969, and in June of 1970 a second son, William, was born to the couple. About 17 months later Cynthia and Robert, Sr., ceased living together. Cynthia left the marital home, taking the children with her. In January of the following year (1972) Robert, Sr., filed for divorce. In February 1972, with Cynthia's consent, the divorce court awarded temporary custody of the children to Robert, Sr., but approximately a week later he asked Cynthia to take care of the children.

Cynthia either was unable or unwilling to retain custody of her children at this time, and, on February 23, 1972, with her consent and that of her husband, the State's Attorney of Will County petitioned the circuit court of Will County, alleging that William and Robert, Jr., were neglected and ought to be adjudged wards of the court. That same day, the court entered an "emergency" order (1) declaring the minors to be wards of the court, (2) temporarily terminating the parental rights of Cynthia and Robert, Sr. (pending disposition of the cause), (3) appointing the Rev. Joseph Shimanek, executive director of the Catholic Charities of the Diocese of Joliet, or his successor in office, as temporary guardian over the children, and (4) scheduling a hearing on the matter for March 7, 1972.

At the March 7 hearing, Cynthia and Robert, Sr., consented to the entry of an order (1) finding that the best interests of William and Robert, Jr., dictated that they be adjudged wards of the court; (2) appointing Rev. Shimanek or his successor as guardian with authority to place the children in a foster home; (3) directing that Robert, Sr., pay $30 per week toward the support of the minors and Cynthia pay $10 per week; (4) "terminating" the parental rights of Robert, Sr., and Cynthia, and (5) retaining jurisdiction "for the purpose of making such further orders as may from time to time be found in accordance with equity and in accordance with the statute

in such case made and provided."

About two months later, on June 2, 1972, a supplemental petition (dated April 18, 1972) was filed, alleging that Cynthia and Robert, Sr., were "unfit" parents within the meaning of sections 1(D)(a) and 1(D)(b) of the Adoption Act (Ill. Rev. Stat. 1971, ch. 4, pars. 9.1–1(D)(a), (b)), in that they had abandoned their children and had failed to maintain a reasonable degree of interest, concern or responsibility as to their welfare. The court appointed separate counsel for Robert, Sr., and Cynthia (who by then had remarried and was known as Cynthia Totherow), and, on July 24, 1972, a hearing was held on the supplemental petition in the circuit court of Will County. Robert, Sr., consented to the decree requested by the State, and the hearing went forward only with regard to Cynthia.

At the hearing, Robert, Sr., testified that, during the course of his marriage to Cynthia, sometimes he would come home from work at noon or 1 p.m. to find that Cynthia was still in bed and William and Robert, Jr., still were locked in their room and had not been fed breakfast, that Cynthia did not change their diapers frequently enough, that she "constantly" left the children with a baby sitter while she went out socially, and that they seldom received a hot cooked meal. Robert admitted, however, on cross-examination that the children received a hot meal three to four times a week, and that because of both his job and his military service his first-hand knowledge of Cynthia's treatment of his children was limited. Robert, Sr., also charged, however, that Cynthia had left the children with a sitter on several occasions when she stayed out late with persons other than him, and that, at the time of their divorce, Cynthia told him that she didn't want temporary custody of the children because they reminded her of him.

Margaret Ward, a social worker from the Catholic

Charities of Joliet, testified that Cynthia had visited her sons several times during the period they were in the custody of the Catholic Charities and foster parents, and that on one occasion during that period she had accompanied one of her sons on a visit to a doctor, and on another occasion she brought a birthday gift to one of her sons. Ms. Ward made clear that all visits with children had to be cleared with the Catholic Charities and foster parents. Ms. Ward also indicated that Cynthia's new husband had been unwilling to assume custody of the children on May 18, but thought that perhaps he and Cynthia would be able to do so by July.

Cynthia herself admitted that her current husband had left her, but that she was hopeful regarding the possibility of reconciliation, and that her mother and a baby sitter would help her to care for the children in the interim. She further admitted that she had sought the assistance of the State's Attorney in obtaining child support in February 1972. The testimony of other witnesses reveals some concern for her mental health, albeit tempered by sympathy for the traumas she had endured in her family life. It is not at all clear that Cynthia's stepfather was aware that Cynthia was still married to her second husband, nor is it clear that he would have agreed to have her live in his home with her children (and his own five-year-old child by Cynthia's mother) had he known this.

In short, there was ample evidence from which the court could and did conclude that the same regretable series of events which had prevented Cynthia from being able to fulfill the responsibilities of parenthood at the time of her original relinquishment of custody had not abated, but had in fact been aggravated by yet another unsuccessful marriage. We know from the record of the "rehearing" that no successful reconciliation was achieved between Cynthia and her husband, and that the circuit court correctly analyzed Cynthia's prospects for establishing any

kind of a stable home life, as she drifted through a succession of jobs and addresses.

It therefore is largely irrelevant to the ultimate disposition of this case that Cynthia did not timely file her notice of appeal from the 1973 order terminating her parental rights, and her reasons for failing to perfect that appeal are equally irrelevant.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Judgment affirmed.*