*In re* SHETINA NOLAN, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellant, *v.* SOPHIA NOLAN, Respondent-Appellee.)

First District (2nd Division)    No. 80-1242

Opinion filed March 31, 1981.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Catherine M. Ryan, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellee.

Faber & Cunniff, Ltd., of Chicago, for *amicus curiae*.

Mr. JUSTICE PERLIN delivered the opinion of the court:

The State prosecutes this interlocutory appeal pursuant to Supreme Court Rule 308 (Ill. Rev. Stat. 1979, ch. 110A, par. 308). The trial court certified and this court has granted leave to appeal the following questions of law:

> "a. Whether the failure of the attorney for the temporary custodian, who accepted a surrender from the mother to notify the mother's attorney of record prior to executing the surrender constitutes fraud thereby invalidating the surrender.

> b. Whether the People of the State of Illinois prior to an adjudicatory hearing has the absolute right to dismiss a neglect petition without prejudice after the mother has filed a motion to withdraw her Consent to Adoption when that consent was taken during pending of the neglect case."

On July 31, 1978, a petition for adjudication of wardship of Shetina Nolan, a 2½-month-old child, was filed pursuant to section 2—4(1)(a) of

the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 702—4(1)(a)). The petition alleged that the child was neglected as to the care necessary for her well-being, and the child was placed in the temporary custody of the Illinois Department of Children and Family Services. The public defender was appointed as the attorney for the mother, Sophia Nolan.[1] The adjudicatory hearing was scheduled for September 22, 1978, but Sophia did not appear.[2]

Sophia signed the adoption surrender on October 30, 1978. On May 14, 1979, Sophia appeared in the neglect proceeding for the first time since July 31, 1978. On May 25, 1979, Sophia filed a motion to withdraw her surrender, which she amended on September 24, 1979. The State at that time orally moved to dismiss the petition for adjudication of wardship. The court denied the State's motion and continued the case until November 14, 1979.

On November 9, 1979, the State filed a written motion to dismiss the petition for adjudication of wardship. The court denied this motion after argument on December 11, 1979, and continued the case for a hearing on Sophia's motion to withdraw her surrender.

On January 29, 1980, the court conducted a hearing on Sophia's motion to withdraw her surrender, at which the following evidence was adduced:

Jane Roiter, a social worker for Child and Family Services, a private agency (unrelated to the Illinois Department of Children and Family Services), testified that she met Sophia on July 30, 1978, and was assigned to be her caseworker. Approximately one week prior to October 30, 1978, Ms. Roiter received a message that Sophia had called her while she was not in her office. Ms. Roiter returned Sophia's call. During the conversation Sophia said that she was leaving town and that she knew a neighbor who could adopt the child. Ms. Roiter inquired whether Sophia's plans to leave town were related to Ms. Roiter's plans to leave the agency. Sophia responded that she felt nobody would care "about her or make plans for Shetina" after Ms. Roiter left. Ms. Roiter urged Sophia to continue with her new caseworker, Jan Franzen.

The following day, October 23, 1978, Ms. Roiter met with Sophia. Sophia again said that she wanted to get away and "felt hopeless about getting Shetina back." When Ms. Roiter informed Sophia that "feeling hopeless" was not a reason to surrender the child for adoption, Sophia responded that it was not the only reason. She said "that her Mom never took care of her and that she wanted Shetina to have a chance that she

---

[1] The court entered an order of default against the unknown father who was given notice by publication.

[2] Sophia also was not present for the next four scheduled appearances on December 28, 1978, January 23, 1979, April 23, 1979, and April 30, 1979.

never had for herself." When Ms. Roiter cautioned Sophia that surrendering the child would be permanent, not temporary, and that she could not change her mind, Sophia responded that "she knew." Pursuant to their conversation, Ms. Roiter called Ms. Amadio, an attorney and social worker for the Illinois Department of Children and Family Services, and arranged an appointment for the surrender.

Ms. Roiter further testified that on the morning of October 30, 1978, she drove Sophia to the courthouse. During the 20-minute drive Ms. Roiter discussed the procedures regarding the surrender and again cautioned Sophia that "this was a permanent decision." When Ms. Roiter asked Sophia if she still desired to surrender the child for adoption, Sophia replied "yes."

Ms. Amadio testified that as part of her duties she "take[s] adoption surrenders from parents." On October 30, 1978, she met with Sophia in an attorney conference room adjoining a courtroom in the juvenile court building. Also present were Ms. Roiter and Ms. Franzen. During the taking of the surrender Sophia was not crying and did not appear to be angry. Ms. Amadio did not know that the neglect proceeding was pending and did not know whether Sophia had an attorney. Although Ms. Amadio often informs parents that they may have their attorney present at the surrender, she could not recall whether she so informed Sophia. Nor could she recall whether she informed the public defender's office of her intent to obtain a surrender from Sophia.

At the adoption surrender conference Ms. Amadio introduced herself to Sophia as "an attorney and social worker from the Illinois Department of Children and Family Services" and explained that it was her "job to meet with people who are considering surrendering their children for adoption." At no time did she represent that she was Sophia's attorney.

Ms. Amadio then read the surrender to Sophia and asked her if she understood it. Sophia replied that she did. Ms. Amadio then asked Sophia if she had any questions, and Sophia responded that she did not. Ms. Amadio then proceeded to explain each paragraph of the surrender by "paraphrasing it in simple language." Ms. Amadio asked Sophia if she understood that "if you sign this, you are giving up all your rights as a parent and you can't ever change your mind or have your child returned to you." Sophia replied that she understood. Ms. Amadio explained that Sophia did not have to surrender the child for adoption. When Ms. Amadio asked Sophia if anyone tried to force her to sign the surrender, had threatened her or made any promises to her, Sophia responded "no." Ms. Amadio asked Ms. Roiter if there had been "any agreement that the foster parents would adopt the child." Ms. Roiter replied that "the child was not yet in an adoptive home." Ms. Amadio then said to Sophia, "If

you are ready to sign this paper, then I would ask you to sign." The surrender was then signed by Sophia and witnessed by Ms. Amadio.

Sophia testified that at the time she executed the surrender she was 18 years old and had attended school through the 10th grade. She further testified that Ms. Amadio said to her that "if [she] sign[ed] the surrender papers [she] wouldn't get [her] baby back," and that she understood.

Sophia also testified that no one mentioned to her that she could have an attorney. Although she could not remember if she asked anyone else if she could see a lawyer, she did not ask Ms. Amadio if she could talk to a public defender. She acknowledged that she knew where the public defender's office was on October 30, 1978. However, she did not recall having a public defender appointed for her in the neglect proceedings on July 31, 1978, nor did she recall talking to a public defender on that date.

Ms. Roiter also testified that after the surrender was executed, she, Ms. Franzen and Sophia went to the cafeteria. Sophia told Ms. Roiter that she was glad she had signed the surrender and wanted to know who would be caring for the child. Ms. Roiter informed her that she did not know who would be caring for the child but that Ms. Franzen would be searching for an adoptive home. Ms. Roiter agreed to permit Sophia to see the child one more time to say good-bye. Sophia was upset because she was not going to see Ms. Roiter again.

At the close of the evidence the State argued that at no time did Sophia testify that she had been misled into signing the surrender. The *guardian ad litem* argued that Sophia understood the consequences of her signing the surrender, intended to terminate her parental rights and did so voluntarily. In spite of this the *guardian ad litem* argued that the surrender was "blemished" because the mother's attorney was not present. The trial court found that "the position stated by the *guardian ad litem* is the correct one with respect to this matter," and that there had been "constructive fraud" in Ms. Amadio's taking of the surrender.

## I.

■■ Section 11 of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1513) provides in pertinent part that "a surrender of a child by a parent, including a minor, to an agency for the purpose of adoption shall be irrevocable unless it shall have been obtained by fraud or duress on the part of the person before whom such * * * surrender * * * is acknowledged pursuant to the provisions of Section 10 of this Act or on the part of the adopting parents or their agents and a court of competent jurisdiction shall so find." This section clearly reflects a legislative recognition of the public policy favoring the finality and stability of adoptions. (*In re Adoption of Hoffman* (1975), 61 Ill. 2d 569, 578, 338 N.E.2d 862, *cert.*

*denied* (1976), 425 U.S. 958, 48 L. Ed. 2d 202, 96 S. Ct. 1738.) To preserve the legislative policy a court should not set aside a surrender executed in accordance with the Adoption Act unless the one seeking to invalidate the document proves by clear and convincing evidence that its execution was procured by fraud or duress. (*Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 432, 369 N.E.2d 858.) It is not contended in the case at bar that the surrender was executed under duress, thus leaving as the issue the question of whether Sophia has proved by clear and convincing evidence that her execution of the surrender was procured by fraud. It is our opinion that Sophia has not sustained this burden of proof.

In defining fraud, our supreme court in both *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 435, and *In re Adoption of Hoffman* (1975), 61 Ill. 2d 569, 578, quoted from *People ex rel. Chicago Bar Association v. Gilmore* (1931), 345 Ill. 28, 46, 177 N.E. 710:

> "Fraud includes anything calculated to deceive, whether it be a single act or a combination of circumstances, whether the suppression of truth or the suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or by silence, by word of mouth or by look or gesture."

Our supreme court in *Regenold v. Baby Fold, Inc.*, elaborated:

> "In *In re Adoption of Hoffman*, 61 Ill. 2d 569, 578, this court, after quoting the definition from *Gilmore*, added ' "the concept of fraud 'implies a wrongful intent—an act calculated to deceive.' " ' (*Exline v. Weldon* (1974), 57 Ill. 2d 105, 110.) We have also observed that 'A misrepresentation in order to constitute a fraud must consist of a statement of material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on the truth of the statement.' *Roth v. Roth* (1970), 45 Ill. 2d 19, 23." 68 Ill. 2d 419, 435-36.

Not even Sophia suggests that anything the Department of Children and Family Services or Carol Amadio, the Department's attorney, did or failed to do, involved a wrongful intent or was calculated to deceive, or that any action or inaction by the Department or its attorney was for the purpose of inducing her to surrender her child. Nor does Sophia suggest that there was any misrepresentation. In fact, the trial court found that "there was no question of moral guilt, no question of actual dishonesty, no question of actual intent to deceive." Instead, Sophia argues and the trial court found that her surrender was a result of "constructive fraud."

Both Sophia and the trial court rely upon *In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 568, 378 N.E.2d 1345, which defines "constructive fraud":

> "However, fraud can also be inferred from the relationship of the

parties or from the surrounding circumstances regardless of any actual dishonesty of purpose. [Citation.] This type, which is called 'constructive fraud,' is defined as any act, statement or omission which amounts to positive fraud or which is construed as a fraud by the courts because of its detrimental effect upon public interests and public or private confidence. It requires neither actual dishonesty nor intent to deceive, being a breach of legal or equitable duty which, irrespective of moral guilt of the wrongdoer, the law declares fraudulent because of its tendency to deceive others. [Citations.]"

We are aware of no case, nor have the parties directed our attention to any case, which has held constructive fraud to be a ground upon which a consent or surrender may be invalidated. To the contrary, as we observed above, our supreme court in both *In re Adoption of Hoffman* and *Regenold v. Baby Fold, Inc.*, found that the concept of fraud as contemplated by the Adoption Act "implies a wrongful intent—an act calculated to deceive."

In the case at bar Sophia signed a document entitled "FINAL AND IRREVOCABLE SURRENDER TO AN AGENCY FOR PURPOSES OF ADOPTION OF A BORN CHILD." It recites "THAT I UNDERSTAND I CANNOT UNDER ANY CIRCUMSTANCES, AFTER SIGNING THIS SURRENDER, CHANGE MY MIND AND REVOKE OR CANCEL THIS SURRENDER, OR OBTAIN OR RECOVER CUSTODY OR ANY OTHER RIGHTS OVER SUCH CHILD." The document further recites "[t]hat I have read and understand the above and I am signing it as my free and voluntary act." It contains a certificate, as required by the Adoption Act, signed by Carol Amadio, stating that Sophia acknowledged that she signed the surrender as her free and voluntary act, and that Ms. Amadio had fully explained to Sophia that by signing the surrender she irrevocably relinquished all parental rights to the child and that Sophia stated that such was her intention and desire. The certificate was duly acknowledged by Ms. Amadio before a notary public in conformance with the requirements of the Adoption Act. The purpose of the formal statutory requirements in the execution of the surrender is to add stability and certainty to adoption proceedings. *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 432.

> "The legislature has not only attempted to add certainty to the adoption proceedings resulting from the execution of such a document, but the formal requirements in its execution have been tailored to insure that the surrender is the free and voluntary act of the mother and that she fully understands the importance of it and the consequences of executing it. Sound policy requires that a

person should not be permitted to easily repudiate this document which complies with the formal requirements of the statute." 68 Ill. 2d 419, 432.

Sophia argues in her appellee's brief that the "court's finding of constructive fraud is not contrary to the manifest weight of the evidence in view of [her] youth and her obvious reliance on the personnel of the custodial agency, who failed to fully inform [her] of her alternatives or suggest that she consult with her appointed counsel." Prior to 1973 the Illinois courts applied the totality of circumstances test: that is, the courts considered all the facts and circumstances surrounding the execution of the surrender to ascertain if any fraud or duress induced its execution. However, our supreme court in *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 436, concluded that the 1973 amendment which required that the fraud or duress be "on the part of the person before whom such * * * surrender * * * is acknowledged * * * or on the part of the adopting parents or their agents" (Ill. Rev. Stat. 1973, ch. 4, par. 9.1—11) was a repudiation by the legislature of the totality approach. Accordingly our review is limited by law to the acts of Ms. Amadio.[3] In addition, our review is further limited to the question of law certified by the trial court pursuant to Supreme Court Rule 308:

> "Whether the failure of the attorney for the temporary custodian, who accepted a surrender from the mother to notify the mother's attorney of record or inform the mother of a right to consult her attorney prior to executing the surrender constitutes fraud thereby invalidating the surrender."

■■ ■ Counseling by an attorney is not a prerequisite to valid parental consent under the Adoption Act. (*In re Hoffman*, at 579; *In re Kerwood* (1977), 44 Ill. App. 3d 1040, 1045, 359 N.E.2d 183.) While it may be desirable for the parents to have legal counsel prior to consenting to the adoption of the child, it is neither constitutionally required (*In re Adoption of Hoffman*, at 579) nor statutorily required by the Adoption Act. Yet Sophia urges that Ms. Amadio's failure to "inform [her] of a right to consult her attorney prior to executing her surrender constitutes fraud thereby invalidating the surrender." Sophia has cited no authorities which so hold, and we are not persuaded that a failure to inform a parent that it may be desirable to have legal counsel constitutes fraud, particularly in view of the absence of a constitutional or statutory right to counsel and the safeguards contained in section 8 of the Adoption Act, which specifies the form of the surrender, and section 10(F) which requires all surrenders of this type be acknowledged by a parent before a judge or other person designated or approved by the court.

---

[3] At the time of the execution of the surrender, prospective adoptive parents for the child had not yet been selected.

Sophia also urges that the "failure of [Ms. Amadio] to notify the mother's attorney of record * * * constitutes fraud thereby invalidating the surrender." Although the record reflects that the public defender was appointed to represent Sophia in the neglect proceeding, there is a total absence of proof that the public defender was Sophia's "attorney of record" for the surrender. The neglect proceeding and the surrender are two separate and distinct proceedings and we cannot, in the absence of proof, infer that the public defender could and would undertake the representation of Sophia for the surrender. In addition, we note that Ms. Amadio did not know of the pending neglect proceeding nor whether Sophia had an attorney. Nor did Sophia ask Ms. Amadio if she could speak with a public defender. Consequently there is no factual basis for Sophia's argument.

Furthermore, we cannot accept Sophia's contention that because Ms. Amadio was a representative of an agency, she would have a conflict of interest in view of the fact that the primary responsibility of caring for the child would be placed in the agency. The legislature has specifically provided that acknowledgment of the voluntariness may be made before an agency representative. Ill. Rev. Stat. 1977, ch. 40, par. 1512(I); *In re Kerwood*.

Sophia also appears to rely on the American Bar Association Code of Professional Responsibility Disciplinary Rule 7—104 to repudiate the surrender. Rule 7—104 provides in pertinent part:

"(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to so do."

We again note that Ms. Amadio did not know that the public defender had been appointed to represent Sophia in the neglect proceeding. Moreover, the legislature has specifically provided that the acknowledgment of voluntariness may be made before an agency representative such as Ms. Amadio.

Applicable here is our supreme court's observations in *Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 440:

"Ordinarily only drastic and extremely unusual circumstances will induce a natural mother to surrender her child. We recognize the circumstances Linda faced as being particularly vexing, and she was undoubtedly induced by the absolute hopelessness of the picture to surrender her child. She, as do many mothers faced with similar conditions, came to accept adoption as the only solution. At

another place or time these same mothers might reject such a solution as being out of the question. In most circumstances following the surrender, the mothers will have second thoughts as to the wisdom of their decisions. Nonetheless, so many significant rights and events depend upon the certainty of the surrender that the legislature, in an expression of sound public policy, in order to add stability to adoption proceedings and to further the welfare of the children involved, has determined that the surrender should only be revocable if 'it shall have been obtained by fraud or duress on the part of the person before whom such consent, surrender, or other document * * * is acknowledged * * * or on the part of the adopting parents or their agents' (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—11). This is peculiarly within the competence of that body, and the judiciary should not attempt to alter or abrogate that clearly expressed legislative determination."

We therefore conclude that Sophia has failed to prove by clear and convincing evidence that her surrender was fraudulently procured.

## II.

■■ The trial court also certified the following question pursuant to Supreme Court Rule 308:

"Whether the People of the State of Illinois prior to an adjudicatory hearing has the absolute right to dismiss a neglect petition without prejudice after the mother has filed a motion to withdraw her Consent to Adoption [*sic*] when that consent [*sic*] was taken during pending of the neglect case?"

Because we have concluded that Sophia has failed to sustain the burden necessary to invalidate the surrender, we find it unnecessary to address this issue. We cannot be certain that any pronouncement on our part with respect to this issue as presented might not be a futile enunciation of abstract principles of law having no bearing upon any presently existing dispute. It is our opinion that Sophia's surrender of the child presumably obviates any necessity that the State proceed with the adjudication of wardship. Courts have determined an issue to be moot when no actual controversy, interests or rights of the parties are presented or involved, or when the issue itself has ceased to exist. An appellate court will not review a case merely to decide moot or abstract questions, to establish precedent, or to render a judgment to guide potential future litigation. *LaSalle National Bank v. City of Chicago* (1954), 3 Ill. 2d 375, 378-79, 121 N.E.2d 486; *Trompeter Construction Co. v. First Federal Savings & Loan Association* (1978), 62 Ill. App. 3d 173, 176, 379 N.E.2d 298.

Accordingly, we reverse the judgment of the circuit court of Cook

County granting Sophia Nolan leave to withdraw her surrender and vacate the trial court's finding that constructive fraud was committed in the taking of the surrender. We remand the cause with directions to dismiss the petition for adjudication of wardship.

Reversed and remanded with directions.

HARTMAN, P. J., and DOWNING, J., concur.