660 S.E.2d 500

**Laura McCANN, Respondent,**

v.

**Jane DOE and John Doe, Appellants.**

**In re Baby McCann.**

No. 26468.

Supreme Court of South Carolina.

Heard Dec. 6, 2007.

Decided April 7, 2008.

---

4. See footnote 3, *supra.*

James Fletcher Thompson, of Spartanburg, for Appellants.

Kenneth L. Tootle, of Beaufort, Scott M. Merrifield, of Quindlen & Merrifield, of Beaufort, for Respondent.

Diane Piazza DeWitt, of Beaufort, for Guardian Ad Litem.

Justice BEATTY:

In this adoption case, the prospective adoptive parents, John and Jane Doe, appeal the family court's orders: (1) revoking Laura McCann's (the biological mother's) consent for adoption because it was involuntarily entered; and (2) finding the revocation of the consent would be in the best interest of the child and placing the child back with McCann. We note both the Does and McCann love and take excellent care of the child. However, our review of the evidence supports the family court's decision to revoke McCann's consent to adopt and to return the child to McCann.

## FACTUAL/PROCEDURAL BACKGROUND

On the afternoon of Wednesday, July 19, 2006, thirty-year-old McCann drove herself to Hilton Head Regional Medical Center while in labor. At the time, McCann had several

emotional stressors in her life, including: (1) her boyfriend had died tragically in a car accident two years prior; (2) her father had died from pancreatic cancer the prior year; (3) the pregnancy was the result of a rape; (4) she hid her pregnancy from her mother, sister, friends, and coworkers because she was ashamed and afraid of their reaction; and (5) she had lost her job during her pregnancy when the restaurant she managed closed down. Although McCann initially informed the hospital staff that she had prenatal care in New York, she later admitted she had not had prenatal care. McCann indicated on the hospital intake forms that she: had a bachelor's degree; worked as a waitress; was of Catholic faith; did not have plans to place the child for adoption; and desired contact with the child. She did not have anyone with her during her delivery and did not want anyone called on her behalf.

McCann delivered a healthy baby girl around 5:00 p.m. that same day. However, McCann did not respond to the child, touch the child, or look at her when the child was placed on McCann's chest. McCann did not want to see the child later in the nursery. Nurse Wendy Yemec thought McCann's flat response to the baby was not normal, and the treating obstetrician ordered a social work consult. McCann was very tearful and remained so for the rest of her hospital stay.

On Thursday, July 20, 2006, McCann had several evaluations. Dr. Ann Gorman, the obstetrician in charge of post-partum care, noted McCann was tearful and learned of McCann's stressors. McCann briefly mentioned adoption to Dr. Gorman.[1] Although she did not diagnose McCann with post-partum depression, Dr. Gorman was concerned that McCann did not have any apparent support system, believed McCann might be at risk for post-partum depression, and ordered a psychiatric consultation with Dr. Srivastava.

That same morning, Judy Hewes[2] performed the social work evaluation on McCann to determine what kind of support

---

1. Although Dr. Gorman's notes reflect McCann was "considering adoption," Dr. Gorman testified McCann personally told her she had decided on adoption because she did not feel at that point in her life that she could handle a baby and McCann seemed at peace with that decision.

2. There is some debate over Hewes' status as either an intern or unlicensed masters social work student. For purposes of this opinion, we merely refer to Hewes as a social worker.

system McCann had and what kind of prenatal care McCann had been given. The two discussed the stressors in McCann's life and Hewes provided McCann with names and telephone numbers of adoption agencies per McCann's request. Hewes informed McCann that she had positive experiences with adoption because two of her siblings were adopted.

Hewes' conversation with McCann was interrupted when Dr. Srivastava entered the room to perform a psychological evaluation. The examination was for the sole purpose of determining whether McCann required further hospitalization for psychological issues due to her incessant crying; he did not evaluate McCann for the purpose of determining whether she could knowingly and intelligently consent to the relinquishment of her child for adoption. After speaking with McCann for less than an hour, Dr. Srivastava determined that, although she had significant stressors in her life, she did not have significant depression requiring hospitalization. He recommended follow-up therapy without medication. Dr. Srivastava diagnosed McCann with "significant adjustment disorder," between anxiety and depression, with a functioning level, or GAF score of 50, which meant partial insight. Although he noted that a GAF score of below 50 would require hospitalization, he testified that "partial insight" meant fair insight within the normal range and not significantly impaired. He stated the diagnosis of adjustment disorder did not impair judgment. Although McCann did not discuss adoption in detail, she told Dr. Srivastava she was considering adoption, she would "feel ok about it," and she did not have enough resources to care for a baby. Dr. Srivastava testified he did not think social stressors would generally affect decision making, and he had no concerns about McCann's ability to make decisions. Dr. Srivastava did not diagnose McCann with postpartum depression because the illness does not generally manifest until some time after delivery, and he did not see signs of post-partum depression in McCann. According to Dr. Srivastava, McCann was initially tearful during their meeting, she smiled at times, and she was able to engage in the conversation and was not tearful by the end.

In the afternoon on July 20th, McCann referred to a business card given to her along with the list of adoption agency names she requested from Hewes, and she called

Helen Duschinski, director of A Child's Future Adoptions, a private adoption agency based in Aiken, South Carolina. McCann testified that she was just exploring options, but Duschinski stated McCann informed her that she had a baby that she wanted to give up for adoption and wanted to know whether there was a family with which the child could be placed. Duschinski agreed to meet with McCann the next morning at the hospital in Hilton Head, and Duschinski contacted the Does about the baby. At some point, Nurse Yemec came in the room and overheard McCann on the phone with Duschinski. Yemec hugged McCann and told her how unselfish and brave she was being in making the adoption decision. McCann requested to see the baby for the first time the evening of July 20th, and the baby stayed in the room with her, for the most part, until discharge the next day. McCann appeared to bond with her baby.

On the morning of Friday, July 21, 2006, Duschinski got lost on her way to the hospital, McCann called her to find out why she was late, and McCann gave Duschinski directions to the hospital. Duschinski testified McCann was clearly resolved in her decision to give the baby up for adoption, and never verbalized any doubts, citing the fact that she was single and there were societal and financial pressures associated with raising a baby. However, McCann denied having made up her mind about adoption when she called Duschinski, but she did not know whether she had told Duschinski she wanted to put her child up for adoption. McCann believed Duschinski worked with the Department of Social Services and would explain the process. Duschinski filled out paperwork, including medical and family history. One of the documents Duschinski had McCann sign regarded counseling and stated, "I acknowledge that counseling is available to me and has been offered to me. I'm aware that counseling will be made available to me should I request it during this pregnancy or within two weeks after delivery." Duschinski testified McCann was crying and laughing during their meeting, trying to lighten the room with humor. She did not think McCann's emotional reaction was unusual.

At that point, Duschinski left the room and the Does' attorney, Rick Corley, and attorney Hector Esquivel, the separate attorney to present the consent form to McCann,

entered the hospital room. Corley left as Esquivel went over the consent for adoption form with McCann and Hewes remained in the room as a witness. McCann believed he was her attorney, although his fees were being paid by the Does. Esquivel testified he went through the consent form line by line, trying to ensure that McCann understood the form and that her consent was voluntary. He stated she did not appear to be in any unusual emotional distress, that she was teary at times, but he believed she was comfortable and resolute. McCann was holding the baby during her meeting with Esquivel.

Esquivel testified he specifically went over the sections regarding the fact that there was no waiting period, that her decision was permanent, and that she had no right to rescission like with financing agreements. At one point he told her the only way to revoke the consent was to go to court and explain the decision was made under duress, but Hewes testified he responded to one of her questions by stating that McCann could go to court to prove she was the better parent in order to "undo it." Esquivel testified that he told her he would leave if she had any doubts, that she could get either legal or other counseling and then decide at a later time whether to proceed with the adoption, but McCann did not want counseling and seemed to understand the gravity of the situation.

One of the documents Esquivel had McCann sign was a medical power of attorney, which stated, "this limited medical power of attorney shall expire upon the surrender of my parental rights in a court proceeding in accordance with South Carolina law unless I earlier revoke it in writing." Although McCann testified that she did not listen to what Esquivel was saying because she was looking at the baby, she admitted that she was calm when she signed the documents. McCann initialed the consent form next to the section stating there is no revocation period.

After signing the documents, McCann refused additional time with the child and handed the child over to Corley. McCann was discharged that same Friday afternoon, drove herself home, and slept for over a day. Both Nurse Yemec and Hewes were so concerned about McCann's emotional well-

being that they separately attempted to call her at her house. On Monday, July 24, 2006, McCann eventually contacted Hewes, who was afraid that McCann might be suicidal. McCann told Hewes that she had contacted the adoption agency because she had changed her mind. Duschinski, however, testified that McCann only contacted her about "some doubts" and never indicated she wanted to revoke her consent.

The adoptive parents filed a petition for adoption on July 26, 2006. McCann filed a Petition for Reversal of Consent on July 27, 2006. An emergency hearing was held on August 16, 2006, and the family court ordered appointment of Diane Dewitt as guardian ad litem for the baby. McCann amended her complaint, and another temporary hearing was held on September 21, 2006. At that point, the family court granted McCann limited, supervised visitation with the baby.

The parties agreed to bifurcate the trial to first deal with the issue of voluntariness of the consent and then to deal with whether revocation of the consent would be in the best interest of the child. On March 1, 2007, the family court issued an order in the first portion of the trial. The family court found that, considering McCann's obvious emotional distress, she could not have voluntarily given her consent. The court found McCann was in an unusual emotional state during her hospital stay, the guidance she received during her hospital stay was not objective and reflective of a realistic approach to the situation McCann faced, and the confusing wording of the counseling form and medical power of attorney form, coupled with Hewes' question to Esquivel, created the impression that McCann had time to revoke. The court further found that the totality of the circumstances:

> created such pressure or had such influence upon Plaintiff that her signing of the document could not have been done voluntarily and that her signing was obtained under duress or through coercion. I find these circumstances left her with the view that she had no reasonable alternative to signing the Consent and Relinquishment and practically destroyed her free will and caused her to do an act not of her own volition and that her act was not the result of rational judgment on her par.

The court held McCann's grant of consent was not voluntary and ordered that McCann have more visitation with the baby pending the outcome of the second part of the trial regarding what was in the best interest for the child.

After the hearing on the best interest analysis, the family court ordered that it was in the best interest of the child for McCann's consent to be revoked and for the child to be placed with McCann. The Court of Appeals granted the Does' motion for supersedeas, held a hearing, and then issued an order vacating the supersedeas and ordering that the parties share custody of the child on a rotating four-day basis. The case is now presently before this Court after it was certified from the Court of Appeals.

## STANDARD OF REVIEW

In appeals concerning adoption proceedings, like any appeal from family court, this Court may find the facts in accordance with its own view of the preponderance of the evidence. *Phillips v. Baker*, 284 S.C. 134, 135, 325 S.E.2d 533, 534 (1985) ("An adoption proceeding being a matter in equity heard by the trial judge alone, this Court's scope of review extends to the finding of facts based on its own view of the preponderance of the evidence."). This broad scope of review does not require the Court to disregard the findings of the family court judge, who saw and heard the witnesses and was in a better position to evaluate their credibility. *Ex parte Morris*, 367 S.C. 56, 61, 624 S.E.2d 649, 652 (2006); *Patel v. Patel*, 359 S.C. 515, 523, 599 S.E.2d 114, 118 (2004). "This degree of deference is especially true in cases involving the welfare and best interests of a minor child." *Morris*, 367 S.C. at 61, 624 S.E.2d at 652.

## I. Voluntariness of Consent

The Does argue the family court erred in finding McCann's consent was involuntary because McCann did not prove duress, coercion, or involuntariness; she only proved she changed her mind.[3] The main question in this case is whether

---

3. The Does raise sixteen sub-issues pointing out facts they allege show McCann failed to meet her burden regarding the involuntary nature of her consent or showing the facts found in the family court's order were

the totality of the circumstances, including emotional stressors from four significant events and McCann's confusion over the significance of the documents she signed, amounts to signing the consent for adoption involuntarily or pursuant to duress or coercion.

Initially, we take this opportunity to comment on the relinquishment law in this state. Several states, including our neighboring states of Georgia and North Carolina, have a time period during which a biological parent can revoke their consent to adopt without having to go to court to prove involuntariness, duress, or coercion. *See* Ga.Code Ann. § 19–8–9(b) (Supp.2007) (giving a biological parent a ten-day period within which he or she can withdraw the consent for adoption); N.C. Gen.Stat. § 48–3–706(a) (2005) (stating that a relinquishment of a child may be revoked within a seven-day period after signing). In the case of a newborn, this relinquishment period allows a biological parent, usually the birth mother, to contemplate her decision away from the physical and emotional effects of giving birth. After the relinquishment period, the law provides that a biological parent may not revoke her consent unless she proves to the court that it was involuntary or given under duress or pursuant to coercion. *See Hicks v. Stargel*, 226 Ga.App. 639, 487 S.E.2d 428, 429 (1997) (holding that there was no reason to revoke the surrendering parents' consent for adoption more than ten days after it was given because there was no evidence of fraud, duress, or incapacity); N.C. Gen.Stat. § 48–3–707(a)(1) (2005) (holding that a relinquishment shall become void if, before entry of the adoption decree, the relinquishing parent establishes by clear and convincing evidence that it was obtained by fraud or duress).

In South Carolina, there is no waiting period before a consent to relinquish a child for adoption becomes effective. Thus, once a parent signs a consent, there is no contemplation time or waiting period during which the consent can be revoked.[4] Withdrawal of the consent is not permitted except by court order after notice and an opportunity to be heard by

not supported by the record. However, each of these issues goes toward the main question regarding voluntariness.

4. There are certain statutory requirements for a consent form. For example, a consent or relinquishment form for the purposes of adoption must specify: (1) that the consent acts to forfeit all rights and obli-

all parties, and "except when the court finds that the withdrawal is in the best interests of the child and that the consent or relinquishment was not given voluntarily or was obtained under duress or through coercion." S.C.Code Ann. § 20–7–1720 (Supp.2007). The burden is on the person seeking to revoke the consent to show the consent was obtained involuntarily. *See Phillips v. Baker,* 284 S.C. 134, 137, 325 S.E.2d 533, 535 (1985) (finding the biological mother failed to establish she executed the consent form under duress).

While an immediately effective consent form may be intended to provide assurances to adoptive parents, it does not reduce the heartbreak from prolonged litigation when a biological parent later changes his or her mind.[5] A reflection period, during which biological parents could closely examine their decision, would assure adoptive parents that the adoption would likely be completed. Although a biological parent could still attempt to revoke consent by proving involuntariness, duress, or coercion, in our view, the likelihood of a challenge to the consent after reflecting during a revocation period would be substantially reduced. However beneficial for both adoptive and biological parents a reflection period may be, it is not the current law in this state, and we must, therefore, apply the law as it currently stands.[6]

gations of the parent to the child; (2) that the consent "must not be withdrawn except by order of the court upon a finding that it is in the best interests of the child;" and (3) that the consent was not voluntary or was obtained through duress or coercion. S.C.Code Ann. § 20–7–1700(A)(6), (7) (Supp.2007). The consent must be signed in the presence of two witnesses, one of which must be either a family court judge, an attorney who does not represent the prospective adoptive parents, or a person certified to obtain consents through the Department of Social Services. S.C.Code Ann. § 20–7–1705(A)(1)—(3) (Supp.2007). Each witness must certify that the provisions of the document were discussed with the person giving consent and that the witness believes that the consent was given voluntarily and was not obtained by coercion or duress. S.C.Code Ann. § 20–7–1705(B) (Supp.2007). Our review of the consent form in the present case shows it met the technical requirements of the statute.

5. As will be discussed further, we are in no way implying by this commentary that McCann merely changed her mind in the present case.

6. Although there is no law allowing a waiting period for a parent to consider the enormous decision to give a child up for adoption, it is

██ The more traditional attack on the consent for relinquishment is that it was given under duress or pursuant to coercion. Duress is defined as " 'a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or form a contract not of his own volition.' " *Phillips*, 284 S.C. at 137, 325 S.E.2d at 535 (quoting *Cherry v. Shelby Mut. Plate Glass & Cas. Co.*, 191 S.C. 177, 183, 4 S.E.2d 123, 126 (1939)). Duress is viewed with a subjective test, looking at the individual characteristics of the person allegedly influenced, and duress does not occur if the person has a reasonable alternative to succumbing and fails to avail themselves of the alternative. *Blejski v. Blejski*, 325 S.C. 491, 498, 480 S.E.2d 462, 466 (Ct.App.1997) (affirming family court's finding that wife's acceptance of settlement agreement was not made under duress where her attorney told her the judge was mad at her and she should accept the agreement or face losing custody of her children; the Court of Appeals found attorney's advice amounted to an opinion and wife had the alternative of taking her chances with a trial).

██ Certainly, many people suffer tragedies in their personal lives that do not rise to the level of the legal definition of duress. In most instances, suffering tragedies prior to having a baby, without more, would not render involuntary a decision to relinquish the child for adoption. However, duress is only one consideration, and the Court may look to other factors,

---

interesting that the law provides for waiting periods in consumer transactions. *See, e.g.*, S.C.Code Ann. § 37–2–502 (2002) (providing that consumers have three days to change their mind about a home solicitation sale). However, the Legislature enacted a waiting period of sorts for biological parents who wish to use the Department of Social Services for adoption placement. *See* S.C.Code Ann. § 20–7–2323 (Supp.2007) ("The Department of Social Services, before it may accept as a client a parent or parents, or prospective parent or parents who wish to relinquish their child for adoption, must first provide them with an informational brochure which outlines the services available from and the procedure used to select adoptive parents by the Department and by the licensed private adoption agencies in this State ... The Department may not accept the above persons as clients until a period of forty-eight hours has elapsed from the time they are furnished this brochure. . . . "). Despite giving parents time to consider whether they wish to use a State or private agency for adoption, there is no similar provision giving parents time to reflect on the more important decision of relinquishment.

including the totality of the circumstances, in making the voluntariness determination. *See Johnson v. Horry County Dep't of Soc. Servs.,* 298 S.C. 355, 356, 380 S.E.2d 830, 831 (1989) (considering many factors in affirming the family court's order finding the consent for adoption was entered voluntarily and adoption would be in the best interest of the children where the birth mother: had an eleventh grade education; was able to understand the documents signed; was not under the influence of incapacitating drugs; was not in any unusual emotional state; and indicated that her consent was freely given and not the product of duress); *see also Burnett v. Burnett,* 290 S.C. 28, 30, 347 S.E.2d 908, 909 (Ct.App.1986) (finding wife entered into domestic settlement agreement voluntarily where there was no evidence that she "was compelled to enter the agreement as a result of being overreached or subjected to any duress, nor is there any evidence that she was not of sound mind or under any unusual stress, other than the stress normally attendant to the break-up of a marriage").

■ Turning to the present case, conflicting evidence was presented in the portion of the trial regarding voluntariness. McCann cried during her testimony, finding the memories painful, but she believed she was now emotionally, mentally, and psychologically strong. She stated she did not recall the delivery, and her recollection of the events in the hospital was very blurry. She denied telling Dr. Srivastava that she was considering adoption. According to McCann, social worker Judy Hewes only gave her adoption as an option, although Hewes also discussed how her sister handled being a single mom. McCann admitted she told Hewes that she felt the baby might be better off with another family.

McCann testified that she thought she had time to make her final adoption decision because of the language in the counseling form indicating she had two weeks and the language in the medical power of attorney that it would expire after a formal court hearing. McCann admitted that she was calm when she signed the legal documents, that she knew adoption was a permanent legal process, and that she had stated in her deposition that she knew the consent documents had significant legal ramifications, but she stated she felt completely overwhelmed. She testified that she contacted Duschinski on

Monday, July 24, 2006, stating she wanted the child back, and she was told by Duschinski that she had ninety days to take legal action. McCann testified that she felt that Hewes, Yemec, and Duschinski misguided her, and she admitted that she felt as though her "raging hormones, lingering pain medication and the unethical treatment of some of the players conspired to lead" her to a poor decision.

McCann also presented the testimony of her treating psychologist, Dr. Bryant Welch, and her treating psychotherapist, Jocelyn Evans. Dr. Welch, who began seeing McCann five weeks after the delivery and reviewed her hospital records, opined that McCann did not voluntarily give her consent for adoption because: (1) women have widely fluctuating emotions postpartum, and the hospital staff all noted McCann's incessant crying; (2) McCann suffered from tremendous stressors, and the cumulative effect impaired her functioning; (3) he believed McCann's GAF score of 50 indicated impaired functioning; and (4) McCann did not get the help she needed from hospital staff, especially Hewes, who was not licensed and only promoted adoption. Welch admitted that Dr. Srivastava did not find McCann had impaired functioning, but argued that the doctor was not evaluating McCann for her ability to sign a consent form.

Jocelyn Evans became McCann's treating psychotherapist some time after McCann filed the underlying action. Evans also testified that McCann was incapable of giving her consent and made her decision "under duress," because of the emotional trauma from the totality of her stressors, she was visibly overwrought, and she was mentally fragile, though not mentally impaired. Evans also noted that she believed a woman should not make her adoption decision within the first forty-eight hours after birth and that Hewes acted unethically in suggesting adoption where McCann had checked "no" to the question of adoption in the hospital intake papers.

Finally, the guardian ad litem, Dewitt, presented her report, stating that McCann was a fit, educated, and mature parent, with support from her mother and sister. Dewitt stated that although she was sure the baby had bonded to some extent with the Does, she was impressed that the child seemed to immediately recognize McCann upon their first visit at eleven

weeks. The family court further heard from Dr. Gorman, Judy Hewes, Nurse Yemec, Helen Duschinski, and attorneys Corley and Esquivel.

Giving great deference to the family court's credibility determinations of the conflicting evidence in the present case, we find there is abundant evidence that McCann's emotional stressors and suffering caused impaired functioning. All of the hospital personnel interacting with McCann noted she was extremely tearful during her stay, and Hewes and Yemec were so concerned about her safety that they contacted her after she left the hospital. Her extreme behavior required a psychological consult to determine solely if McCann could care for herself and be released from the hospital. Dr. Srivastava did not evaluate McCann for her ability to make the adoption decision, and he noted McCann was functioning with only partial insight, as indicated by her GAF score of 50. Despite Dr. Srivastava's deposition testimony that partial insight meant McCann was not significantly impaired, her score was one point away from requiring further hospitalization. Further, the only persons who actually evaluated McCann for her ability to consent to relinquishment, Dr. Welch and Jocelyn Evans, both opined after reviewing all the evidence and records in the case that McCann was incapable of giving her voluntary consent for adoption at the time she was in the hospital.

Further, while McCann was suffering from impaired functioning, she was encouraged by others regarding the adoption decision, she was presented with a counseling form that led her to believe she had a two-week time period in which to consider the adoption decision,[7] the medical power of attorney form created an impression there was a time period before a court terminated her parental rights or before her consent was valid, and the attorney obtaining her signature made a statement that she would have to prove she was the better parent in order to get her child back. Based on the totality of the circumstances in this case, we agree with the family court

---

7. As with the consent form, we do not find anything particularly misleading about the counseling or medical power of attorney forms. However, because McCann had impaired functioning in the present case, we give great deference to the family court's determination that McCann's testimony in this regard was credible.

that McCann proved her consent for relinquishment was involuntary.

## II. Best Interest

██ The Does also appeal the finding that it was in the best interest of the child for the consent to be withdrawn and for the child to be awarded to McCann based on the biological connection.

 As previously discussed, before a biological parent can withdraw her consent to adoption, the family court must make a determination that withdrawal is in the best interest of the child *and* that the consent was not voluntarily given or was the product of duress or coercion. S.C.Code Ann. § 20–7–1720 (Supp.2007). "The best interest of the child remains, always, the paramount consideration in every adoption." *Dunn v. Dunn,* 298 S.C. 365, 367, 380 S.E.2d 836, 837 (1989); *Doe v. Roe,* 369 S.C. 351, 371, 631 S.E.2d 317, 328 (Ct.App. 2006) (noting that the best interest of the child is the ultimate consideration). The state also recognizes a rebuttable presumption in custody matters that it is the best interest for the child to be placed with a biological parent over a third party. *Moore v. Moore,* 300 S.C. 75, 78, 386 S.E.2d 456, 458 (1989).[8]

After the hearing on the second portion of the trial regarding whether revocation of the consent was in the best interest of the baby, the family court informed the parties on April 21, 2007, that the baby should be placed with McCann. In the

---

8. The Does complain the family court erred in using the best interest analysis applied in custody situations, including the preference for the biological parent, because the revocation statute does not indicate a preference for the biological parent over the adoptive parent. The statute does not indicate the best interest analysis to be employed is any different from that used in any other case concerning the welfare of children. While we understand the Does' concern that the presumption in favor of biological parents would devastate any chance an adoptive parent had of enforcing the relinquishment in the face of a challenge, we note the statute requires the biological parent to prove both: (1) the consent was involuntary; *and* (2) withdrawal was in the best interest of the child. Aside from the situation before us, the burden of proving the involuntariness of the consent for relinquishment is generally difficult. Because a challenge to the consent for relinquishment may only occur prior to an adoption, the dispute concerns a custody determination and the normal best interest analysis in custody disputes should be employed.

written order filed May 4, 2007, the court noted that McCann: had a suitable home; was well-educated and financially stable; had bonded with the child; had strong family support; and demonstrated "natural, instinctive and appropriate parenting skills and great motivation to being the full-time parent, nurturer, and protector of the child." The court also noted that both McCann and the Does were "people of character and integrity who are committed to the well-being of this beautiful child," and that the Does had demonstrated a great capacity for parenting and had a loving, nurturing home. However, the court found that under the facts and circumstances of the case, it would be in the best interest of the child to be raised by McCann, her biological mother, and it ordered the child to be placed with McCann by May 6, 2007.

Both McCann and the Does presented evidence that they have sufficient housing, financial resources, extended support systems, and child care options. McCann and the Does appear to be fit, they all obviously love the baby very much, and, with the exception of the first eleven weeks of her life, the baby has spent much time in both households bonding with the parties and the extended families. However, in light of the involuntariness of McCann's consent for relinquishment, we agree with the family court that it would be in the child's best interest for the consent to be withdrawn. Further, with both sides proving an equal ability to care for the child, we agree with the family court that it would be in the child's best interest for custody to be returned to McCann, the biological parent.

## CONCLUSION

Adoption is a wonderful institution, bringing together parents who want children with children who need loving homes. However, protections need to be in place for both biological and adoptive parents to ensure the decision to give a child for adoption is a thoughtful and certain one and not likely to be challenged in a long, arduous, and emotionally-wrenching legal process as has happened in this case.

Nevertheless, we agree with the family court in the present case that, looking at the totality of the circumstances, McCann proved she was incapable of giving a voluntary consent. It is

in the best interest of the child for the consent for relinquishment be revoked and the child to be returned to McCann.

**AFFIRMED.**

TOAL, C.J., and MOORE, J., concur. PLEICONES, J., concurring in result. WALLER, J., dissenting in a separate opinion.

Justice WALLER:

I respectfully dissent. In my opinion, the evidence clearly establishes that the biological mother, Laura McCann, voluntarily signed a relinquishment form which complied with the statutory requirements set out by the Legislature. *See* S.C.Code Ann. §§ 20–7–1700 & –1705 (Supp.2007). Because the relinquishment form complied with the statute, and McCann failed to prove duress or coercion, I would hold that the family court erred by revoking McCann's consent to the adoption.

"Relinquishment" is defined as:

[T]he informed and voluntary release in writing of all parental rights with respect to a child by a parent to a child placing agency or to a person who facilitates the placement of a child for the purpose of adoption and to whom the parent has given the right to consent to the adoption of the child.

S.C.Code Ann. § 20–7–1650(h) (Supp.2007).[9] Withdrawal of any consent or relinquishment is permitted **only** when the court finds [10] the withdrawal is in the best interests of the child **and** the consent or relinquishment was given involuntarily or was obtained under duress or through coercion. S.C.Code Ann. § 20–7–1720 (Supp.2007).

---

**9.** I focus on the term "relinquishment" because this is "commonly used to refer to a mother's surrender of parental rights to an adoption agency that will place the child with adoptive parents." Elizabeth J. Samuels, *Time To Decide? The Laws Governing Mothers' Consents To The Adoption Of Their Newborn Infants,* 72 Tenn. L.Rev. 509, 511 n. 5 (2005).

**10.** On appeal from the family court, this Court may find facts based on its own view of the preponderance of the evidence. *E.g., Phillips v. Baker,* 284 S.C. 134, 325 S.E.2d 533 (1985).

The majority concludes that the evidence showed McCann's "emotional stressors and suffering caused impaired functioning," which in turn rendered her relinquishment involuntary. However, an action is involuntary when it is performed under duress, force, or coercion,[11] and the crux of this case really is whether McCann acted while under duress. As noted by the majority opinion, duress is " 'a condition of mind produced by improper **external** pressure or influence that practically destroys the free agency of a party and causes [her] to do an act or form a contract not of [her] own volition.' " *Phillips v. Baker*, 284 S.C. 134, 137, 325 S.E.2d 533, 535 (1985) (emphasis added, citation omitted).

In my opinion, there is no compelling evidence that McCann's "emotional stressors" were anything but internal in nature.[12] Therefore, although I would agree with the family court's conclusion that McCann was in an emotional state, the family court erred in finding her consent was given involuntarily. Circumstances such as temporary depression or emotional distress simply are not sufficient, in and of themselves, to invalidate a consent to adoption. *See, e.g., In re J.N.*, 123 Wash.App. 564, 95 P.3d 414, 419 (2004) ("emotional stress alone does not vitiate an otherwise voluntary decision to relinquish parental rights"), *review denied*, 154 Wash.2d 1003, 114 P.3d 1198 (2005); *Boatwright v. Walker*, 715 S.W.2d 237, 242–43 (Ky.Ct.App.1986) (consent to adoption will not be revoked based upon emotional distress or temporary depression; a showing of fraud or duress is required); *Regenold v. Baby Fold, Inc.*, 42 Ill.App.3d 39, 355 N.E.2d 361, 363–65 (1976) (where the 19–year–old biological mother was experiencing "a great deal of stress," the court nonetheless reversed the lower court's finding of duress because there was no evidence that her consent to adoption was the product of "third party persuasion, inducement, deception, or domination"), *aff'd* 68 Ill.2d 419, 12 Ill.Dec. 151, 369 N.E.2d 858 (1977).

---

**11.** *Black's Law Dictionary* 574 (6th ed.1991).

**12.** I certainly do not contend that any emotions McCann felt were not real, were in any way insignificant, or were her fault. I focus instead on the fact that these emotional pressures clearly were not generated or caused by the people around her, and therefore do not meet the pressures required by the legal definition of duress.

Moreover, to suggest that because others offered support to McCann regarding her adoption decision, this encouragement somehow acted to coerce McCann into signing the relinquishment is a sad commentary, indeed. Support for a parent's choice to place a baby for adoption is something that should be promoted, although clearly the decision should never be forced upon a parent.[13]

Furthermore, there is significant evidence which clearly refutes the idea that McCann was in any way coerced to give up her baby for adoption. For example, McCann **herself:** (1) initially raised the issue of adoption to her nurses and postpartum obstetrician; (2) requested information about adoption agencies from the social worker; (3) called the private adoption agency and arranged a meeting with Helen Duschinski for the next day at the hospital; and (4) called Duschinski when she was late arriving and gave her directions to the hospital.

Duschinski eventually arrived with the Does' attorney, Rick Corley, and another attorney, Hector Esquivel. However, only Esquivel and the social worker remained in the hospital room with McCann while Esquivel went over all the forms in detail. McCann thereafter signed various documents.

Of most importance to the instant case is the relinquishment form, which was entitled "CONSENT TO ADOPTION." As previously mentioned, and as conceded by the majority, this form complied with the statutory requirements.[14] *See* §§ 20–7–1700 & –1705. The purpose of these statutes is "to ensure that birth parents freely and voluntarily consent to relinquish

---

13. *See In re Comm'r of Soc. Servs., Suffolk County,* 141 A.D.2d 821, 529 N.Y.S.2d 883 (N.Y.App.Div.1988). In this New York case, the appellate court appropriately rejected the birth mother's claim that her consent to adoption had been coerced even though the pregnancy was the result of a rape. Notably, the court found that her husband's encouragement "did not render the circumstances coercive nor did his entreaties impair her ability to exercise her free will." *Id.* at 884; *see also Anonymous v. Anonymous,* 23 Ariz.App. 50, 530 P.2d 896, 898–99 (1975) (although birth mother's church official advised her in the hospital to "release the baby for adoption," this did not constitute duress).

14. In addition, although not specifically required by statute, the form expressly stated the following: "I understand that there is no revocation period during which I may withdraw this consent, and that the consent is effective immediately upon my signing the consent."

their particular child, and do not do so under conditions of duress." *Doe v. Clark,* 318 S.C. 274, 277, 457 S.E.2d 336, 338 (1995) (Waller, J., dissenting).

The main reason this particular form is so crucial is because, under South Carolina law, there simply is no waiting period before a relinquishment of parental rights becomes effective. It is the Legislature, not this Court, that has made this pronouncement. " 'The legal rules on the timing of consents are ultimately a compromise between the interest in protecting biological mothers from making hasty or ill-informed decisions at a time of great physical and emotional stress, and the interest in expediting the adoption process for newborns.' " Elizabeth J. Samuels, *Time To Decide? The Laws Governing Mothers' Consents To The Adoption Of Their Newborn Infants,* 72 Tenn. L.Rev. 509, 541 (2005) (citation omitted).

The Legislature has chosen to safeguard this difficult decision-making process with certain requirements regarding both the "form and content" of a consent or relinquishment form and the process employed at the actual signing of the form. *See* §§ 20–7–1700 & –1705. There are numerous other states that, unlike South Carolina, provide for various waiting and/or revocation periods.[15] Nonetheless, this Court simply is not empowered "to effect a change in the statutes enacted by the Legislature." *State v. Corey D.,* 339 S.C. 107, 120, 529 S.E.2d 20, 27 (2000).

In other words, although it might seem unwise that under South Carolina law a biological parent does not have even a few days to retract such an important decision as relinquishing one's rights to her own child, this Court may not "second guess the wisdom or folly of decisions of the Legislature." *Id.*

---

15. An interesting example is Vermont where a biological parent may not even execute a relinquishment until at least 36 hours after the baby is born and then may revoke the relinquishment within 21 days after the relinquishment was executed. *See* 15A Vt. Stat. Ann. § 2–404(a) (2002); *see generally,* Cynthia Ellen Szejner, Note, *Intercountry Adoptions: Are The Biological Parents' Rights Protected?,* 5 Wash. U. Global Stud. L.Rev. 211, 214 & n. 24 (2006) (where the author notes the "length of time that adoption statutes allow for a birth parent to revoke consent to the adoption varies among the States" and also cites 39 different state statutes, most of which have a time period during which consent may be revoked without a showing of fraud or duress).

at 121, 529 S.E.2d 20, 27 (citing *Keyserling v. Beasley,* 322 S.C. 83, 86, 470 S.E.2d 100, 101 (1996)).

The Legislature has set the parameters for adoption. Thus, in order to have her consent to adoption withdrawn, McCann was required to prove her "relinquishment was given involuntarily or was obtained under duress or through coercion." § 20–7–1720. Because it is my opinion McCann did not make such a showing, I would reverse the family court's order revoking McCann's consent to the adoption.