# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Jennifer Brown, Petitioner,

v.

Baby Girl Harper, a minor under the age of seven, and
Holly Lawrence, Respondents.

Appellate Case No. 2014-001746

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Charleston County
Ronald R. Norton, Family Court Judge

---

Opinion No. 27448
Heard September 23, 2014 – Filed September 29, 2014

---

### AFFIRMED

---

John S. Nichols, of Bluestein Nichols Thompson &
Delgado, LLC, of Columbia, and Shannon Phillips Jones,
of Shannon Jones, Attorney at Law, LLC, of Charleston,
for Petitioner.

Allison Boyd Bullard, of Harling & West, LLC, of
Lexington, and James Fletcher Thompson, of James
Fletcher Thompson, LLC, of Spartanburg, for
Respondent.

**CHIEF JUSTICE TOAL:**    Petitioner Jennifer Brown (Adoptive Mother) appeals the court of appeals' decision affirming the family court order finding Respondent Holly Lawrence's (Birth Mother) consent to adoption was invalid and requiring immediate return of Baby Girl Harper (Baby Girl) to Birth Mother.  We affirm.

### FACTS/PROCEDURAL BACKGROUND

Birth Mother, a resident of Charlotte, North Carolina, gave birth to Baby Girl on October 27, 2013, in Pineville, North Carolina.  On October 30, 2013, Birth Mother signed a Consent to Adoption form (the Consent) in Charleston, South Carolina, in which she consented to Adoptive Mother's adoption of Baby Girl.

Birth Mother was twenty-three years old when she learned that she was pregnant very late in the pregnancy.  She received no prenatal care.  She did not tell her parents she was pregnant, even though she lived with them.  She gave birth alone after presenting to the emergency room when she went into labor with Baby Girl.  Shortly after the birth, Birth Mother mentioned to hospital staff that she might be interested in placing Baby Girl for adoption.  The hospital social worker advised her that, under North Carolina law, she could not make any decision regarding adoption for twenty-four hours following the birth.   Other hospital workers were aware that Birth Mother was considering adoption, including the nurse midwife who delivered Baby Girl.  The nurse midwife told Birth Mother that the nurse midwife's cousin in South Carolina, Adoptive Mother, was considering adoption, and gave her Adoptive Mother's telephone number.[1]

On October 28, Birth Mother and Adoptive Mother spoke via telephone about a potential adoption, and Adoptive Mother indicated that she would contact a lawyer.  Birth Mother and Adoptive Mother also verbally agreed that the adoption would be an "open" adoption, which would mean Birth Mother could have visitation, send cards, and otherwise be a part of Baby Girl's life.  At some point that same day, Birth Mother was informed that after inquiring with several attorneys, Adoptive Mother could not afford to adopt Baby Girl.

---

[1] Adoptive Mother is a 41-year-old divorcée with no other children.  She testified she had thought about adoption in the past, but was not actively seeking to adopt a child when her cousin, the nurse midwife, contacted her about Baby Girl.

Birth Mother was discharged from the hospital on October 28 prior to Baby Girl's release. On October 29, the nurse midwife called Birth Mother to inform her that Adoptive Mother found a lawyer to assist her with the adoption. From that point, it appears from the Record that attempts were made to conceal the pending adoption. For example, in one text message exchange between Birth Mother and Adoptive Mother, Adoptive Mother stated, "[D]on't tell anyone you are coming here." Furthermore, the nurse midwife hid her vehicle behind bushes at the hospital so that her colleagues could not see her collecting Birth Mother and Baby Girl to transport them to South Carolina.

The nurse midwife bought a car seat and drove Birth Mother and Baby Girl to Columbia. There, they met Adoptive Mother's sister, who drove them the rest of the way to Charleston. The sister paid for Birth Mother and Baby Girl to stay in a local hotel overnight. The next morning, Birth Mother and Baby Girl went to Adoptive Mother's lawyer's office to execute the Consent and related documents. This was the first time that Birth Mother and Adoptive Mother met. Upon meeting, Adoptive Mother testified that they hugged and cried. Birth Mother assured Adoptive Mother she was not going to change her mind. Adoptive Mother felt that Birth Mother was certain about going forward with the adoption.

Adoptive Mother's lawyer rented office space in an executive suite shared by other law firms, including the law firm where the attorney-witness worked.[2] On the morning of the adoption, Adoptive Mother's lawyer asked the attorney-witness to act as a witness to the execution of the Consent. In addition, Adoptive Mother's lawyer asked a legal assistant from another law firm that also shared the office suite to be the second witness to the adoption.[3]

Birth Mother's signature appears on the Consent and other relevant forms, and she stipulated at the hearing that she signed the Consent voluntarily.

The legal assistant was present when Birth Mother signed the Consent, but

---

[2] The attorney-witness has been admitted to practice law in South Carolina since 2006 and generally does not practice in the area of family law, although she has been appointed to handle child abuse and neglect cases.

[3] That witness testified: "I was just walking by and [Adoptive Mother's lawyer] grabbed me and asked me to come in." Like the attorney-witness, the second witness had never been involved in an adoption case or witnessed a relinquishment prior to this instance.

did not see her initial the remainder of the document. She understood her role to be that of a witness to Birth Mother's signature. Adoptive Mother's lawyer notarized Birth Mother's signature.

However, the attorney-witness did not enter the room until after Birth Mother signed the Consent, although she had the impression that Birth Mother had signed the Consent shortly before she entered the room.[4] Neither witness was present for any discussions between Adoptive Mother's lawyer and Birth Mother regarding the Consent. The attorney-witness testified that she believed that Adoptive Mother's lawyer had explained the Consent to Birth Mother outside of her presence. Once the witnesses were in the room, Adoptive Mother's lawyer restated his prior conversation with Birth Mother in summary fashion. The witnesses signed the Consent, and the attorney-witness's law clerk notarized their signatures.[5] The entire transaction lasted approximately ten minutes.

Birth Mother left the office with Adoptive Mother's mother, who drove Birth Mother back to the local hotel where she had spent the previous night. Birth Mother spent time alone with Baby Girl there, and then relinquished Baby Girl to Adoptive Mother. However, Birth Mother explained that she "felt immediately that something was not right with the process." Birth Mother remained at the hotel alone until a friend of Adoptive Mother retrieved her and drove her back to Charlotte.

Five days later, on November 5, 2013, Birth Mother sent a registered letter to Adoptive Mother's lawyer formally revoking her consent. Adoptive Mother's action for court approval of this adoption is still pending.

On April 24, 2014, the family court issued an order in a bifurcated hearing

---

[4] The attorney-witness believed that if Birth Mother acknowledged her signature in her presence, notarial standards applied, and she could act as a witness and sign. She explained: "[Birth Mother] understood . . . what was there. She acknowledge[d] to me that she understood it before she acknowledged her signature."

[5] Birth Mother believed that everyone inside the conference room worked for Adoptive Mother's lawyer. However, she signed a form stating that she understood that Adoptive Mother's lawyer represented Adoptive Mother; that Adoptive Mother was willing to pay for her to obtain legal counsel; and that she was entitled to counseling at no expense to her.

finding the Consent was invalid and requiring Baby Girl's immediate return to Birth Mother. In its order, the family court noted the only issue presented to the court was "whether the consent document was properly executed and, based on that ruling, whether Birth Mother's request for emergency transfer of legal and physical custody of the minor be granted." The court held that the relevant statutory provisions were clear and mandatory, such that strict compliance was required. The court further held "the absence of the attorney[-]witness, a witness required by statute, renders the document invalid." The court stated that "since the attorney[-] witness acknowledges she was not present when the document was signed . . . she cannot certify that the provisions of the document were discussed with [Birth] Mother prior to signing." The family court added that each of the alleged defects on their own would render the Consent invalid, "but when combined strengthens further this [c]ourt's ruling that the Consent is invalid."

On August 4, 2014, the court of appeals affirmed the family court, finding (1) that the order was immediately appealable; (2) that the execution of a consent to adopt document must strictly adhere to section 63-9-340 of the South Carolina Code; and (3) that the Consent was invalid because the attorney-witness was not present when Birth Mother signed the document, and neither witness undertook to discuss the provisions of the Consent with Birth Mother prior to her signature. *Brown v. Harper*, ___ S.C. ___, 761 S.E.2d 779, 779 (Ct. App. 2014).

On August 20, 2014, this Court granted Adoptive Mother's petition for a writ of certiorari to review the court of appeals' decision and expedited oral arguments.

## ANALYSIS

### I. Consent

"Consent lies at the foundation of the adoption process," and therefore, "[i]n order for the court to issue a valid adoption decree, it must appear that the parent has consented or otherwise forfeited his or her parental rights." *Gardner v. Baby Edward*, 288 S.C. 332, 333, 342 S.E.2d 601, 602 (1986) (citing *D'Augustine v. Bush,* 269 S.C. 342, 237 S.E.2d 384 (1977)).

Adoptions are conducted pursuant to the South Carolina Adoption Act (the Adoption Act). *See* S.C. Code Ann. §§ 63-9-10 to -2290 (2010 & Supp. 2013). Under the Adoption Act, "[c]onsent or relinquishment for the purpose of adoption is required of the following persons: . . . . the mother of a child born when the mother was not married . . . ." S.C. Code Ann. § 63-9-310(A)(3). To effect this

consent, section 63-9-330(A) requires that consent be made by a sworn document signed by the person giving consent and specifies the contents of such document. To formally execute a consent,

> [t]he sworn document provided for in Section 63-9-330, which gives consent or relinquishment for the purpose of adoption, *must be signed in the presence of two witnesses one of whom must be one of the following*:
>
> > (1) a judge of any family court in this State;
> >
> > (2) *an attorney licensed to practice law in South Carolina who does not represent the prospective adoption petitioners*;
> >
> > (3) a person certified by the State Department of Social Services, pursuant to Section 63-9-360, to obtain consents or relinquishments.

S.C. Code Ann. § 63-9-340(A) (emphasis added). In addition, witnesses:

> *shall attach* to the document *written certification* signed by each witness *that before the signing of the document, the provisions of the document were discussed with the person giving consent or relinquishment, and that based on this discussion*, it is each witness' opinion that consent or relinquishment is being given voluntarily and that it is not being obtained under duress or through coercion.

*Id.* § 63-9-340(B) (emphasis added).

Once consent is given, it cannot be withdrawn "except by order of the court after notice and opportunity to be heard is given to all persons concerned, and except when the court finds that the withdrawal is in the best interests of the child and that the consent or relinquishment was not given voluntarily or was obtained under duress or through coercion." *Id.* § 63-9-350. Consequently, South Carolina has a long history of strict construction of adoption statutes:

> It is stated in many cases that adoption statutes providing for a procedure or method by which one person may be adopted as the child of another are in derogation of the common law and, therefore, to be strictly construed in favor of the parent and the preservation of the

relationship of parent and child. The rationale of this rule is apparent when we consider that when a final decree of adoption is entered, the natural parents of the adopted child, unless they are the adoptive parents, are relieved of all parental responsibilities for the child and have no rights over such adopted child.

*Goff v. Benedict*, 252 S.C. 83, 86–87, 165 S.E.2d 269, 271 (1969) (internal citations omitted), *overruled on other grounds by Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 536 S.E.2d 372 (2000); *see also Hucks v. Dolan,* 288 S.C. 468, 470, 343 S.E.2d 613, 614 (1986) ("Adoption exists in this state only by virtue of statutory authority which expressly prescribes the conditions under which an adoption may legally be effected. Since the right of adoption in South Carolina is not a natural right but wholly statutory, it must be strictly construed." (citation omitted)).

Here, the parties agree that there were two statutory violations concerning the *execution*: (1) Birth Mother did not sign the Consent in the presence of two witnesses, *see* section 63-9-340(A); and (2) although the witnesses believed a discussion of the Consent occurred, the witnesses were not present for the lawyer's discussion with Birth Mother, and therefore could not certify that the provisions of the Consent were discussed with Birth Mother before she signed the document and that her consent was given voluntarily, *see* S.C. Code Ann. § 63-9-340(B). Thus, Adoptive Mother can prevail only if we use the concept of substantial compliance[6] to find the execution of the Consent valid under the Adoption Act. Here, we hold that substantial compliance cannot cure the failure to comply with the relevant requirements for formal execution of the consent.[7]

First, the plain, mandatory language of section 63-9-340 weighs against adopting a substantial compliance paradigm with respect to the formalities of execution of a consent to adoption. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts

---

[6] Substantial compliance has been defined as "compliance in respect to the essential matters necessary to assure every reasonable objective of the statute." *Orr v. Heiman*, 12 P.3d 387, 389 (Kan. 2000).

[7] We make clear that our decision is narrow and fact-based, and we are not precluding the use of substantial compliance in future cases where technical defects in the consent, such as a scrivener's error, may be at stake. We reach our decision here because the defects in *execution* were material and egregious.

are bound to give effect to the expressed intent of the legislature." (citation omitted)); *see also State v. Morgan*, 352 S.C. 359, 367, 574 S.E.2d 203, 207 (Ct. App. 2002) ("The statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers." (citation omitted)).

Moreover, a finding of substantial compliance here would not further the purposes of the Adoption Act. *See* S.C. Code Ann. § 63-9-20 ("The purpose of this article is to establish fair and reasonable procedures for the adoption of children . . . ."); *Liberty Mut. Ins. Co. v. S.C. Second Injury Fund*, 363 S.C. 612, 621, 611 S.E.2d 297, 301 (Ct. App. 2005) (citations omitted) ("All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute." (citations omitted)).

We agree with the court of appeals that "[t]he legislature intended that strict compliance with the procedures set forth in section 63-9-340 be required in order to reduce litigation, promote finality, and ensure consent documents are voluntary." *Brown*, ___ S.C. at ___, 761 S.E.2d at 780.  Furthermore,

> The main reason [a consent form] is so crucial is because, under South Carolina law, there simply is no waiting period before a relinquishment of parental rights becomes effective. It is the Legislature, not this Court, that has made this pronouncement. The legal rules on the timing of consents are ultimately a compromise between the interest in protecting biological mothers from making hasty or ill-informed decisions at a time of great physical and emotional stress, and the interest in expediting the adoption process for newborns.

> The Legislature has chosen to safeguard this difficult decision-making process with certain requirements regarding both the form and content of a consent or relinquishment form and the process employed at the actual signing of the form.

*McCann v. Doe*, 377 S.C. 373, 393–94, 660 S.E.2d 500, 511–12 (2008) (Waller, J., dissenting) (footnotes omitted) (citations omitted) (quotation marks omitted)). Thus, the statutory formalities have heightened relevance and importance under South Carolina law, as the formalities are the only clear line separating a biological parent's rights with respect to the child prior to the adoption, from the finality and

irrevocability resulting from the execution of the formalities.

Accordingly, we hold that the Consent is invalid.

## II. Best Interests of the Child

In *McCann*, this Court noted, "The best interest of the child remains, always, the paramount consideration in every adoption." 377 S.C. at 389, 660 S.E.2d at 509 (citation omitted) (quoting *Dunn v. Dunn,* 298 S.C. 365, 367, 380 S.E.2d 836, 837 (1989); *Doe v. Roe,* 369 S.C. 351, 371, 631 S.E.2d 317, 328 (Ct.App.2006)). The Court stated further:

> Because a challenge to the consent for relinquishment may only occur prior to an adoption, the dispute concerns a custody determination and the normal best interest analysis in custody disputes should be employed.

*Id.*; *see also* S.C. Code Ann, §§ 63-9-330(A)(7), -350.

Because we have declared the Consent to be invalid, then the law presumes that it is in a child's best interests to be in the custody of her biological parent. *McCann*, 377 S.C. at 389, 660 S.E.2d at 509 ("The state . . . recognizes a rebuttable presumption in custody matters that it is the best interest for the child to be placed with a biological parent over a third party.") (citing *Moore v. Moore,* 300 S.C. 75, 78, 386 S.E.2d 456, 458 (1989)). Nothing in the Record conclusively rebuts this presumption. Accordingly, we find the transfer of custody is in Baby Girl's best interests.[8]

CONCLUSION

Although we note with sadness that Adoptive Mother is a loving mother to Baby Girl, for the foregoing reasons, we affirm the court of appeals. Because we declare the Consent invalid, we order the transfer of Baby Girl to Birth Mother. *See* S.C. Code Ann. § 63-17-20(B) ("The custody of an illegitimate child is solely

---

[8] As these issues are dispositive, we decline to reach the issue of ratification. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999). With respect to Adoptive Mother's request for attorneys' fees, because Adoptive Mother was not the prevailing party on appeal, an award of attorneys' fees would be inappropriate.

in the natural mother unless the mother has relinquished her rights to the child."). The transfer should occur as soon as any petition for rehearing has been acted upon by the Court, unless the Court grants rehearing. We direct that a petition for rehearing, if any, be received by the Court within five days after the filing of this opinion and direct a response to such petition be received within three days of the filing of the petition for rehearing.

**AFFIRMED.**

**PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.**