708 S.E.2d 778

**Jane ROE and John Roe, Appellants,**

**v.**

**Craig REEVES, Victoria A., John Doe, Biological Father and Baby Boy, an infant, Respondents.**

**No. 26967.**

Supreme Court of South Carolina.

Heard Dec. 2, 2010.
Decided May 2, 2011.
Rehearing Denied May 18, 2011.

---

Philip J. Temple, Temple, Mann, Briggs & Hill, of Greenville, and Robert Norris Hill, Law Offices of Robert Hill, of Newberry, for Appellants.

Andrea B. Williams, of Greenville, and Mary Alice H. Godfrey, Godfrey Law Firm, of Greenville, for Respondents.

Katherine H. Tiffany, Guardian Ad Litem, of Carter Smith Merriam Rogers & Traxler, of Greenville.

Justice HEARN.

In this case, Craig Reeves (Father) claims his consent was necessary prior to another couple adopting his child. The family court agreed, finding that he met the requirements of Section 63–9–310(A)(5)(b) of the South Carolina Code (2010) and awarding him custody of the child. We find that Father did not undertake sufficient good faith efforts to assume parental responsibility and comply with section 63–9–310(A)(5)(b), and hold that his consent to the adoption is not required. Therefore, we reverse the family court and order that custody be immediately returned to the adoptive parents (Appellants).

## FACTUAL/PROCEDURAL BACKGROUND

Father began a sexual relationship with Victoria A. (Mother) in July 2007, when he was nineteen years old and she was fifteen.[1] At that time, Mother already had one son from a previous relationship with another man. Mother and Father's relationship was not a stable one. Over the next several months, Mother and Father broke up and reconciled several times. However, in May 2008, Mother, then sixteen years old, discovered she was pregnant with Father's child. She first told him that she was pregnant in July, at which point he was in a relationship with another woman. His response was less than encouraging. He initially texted her, "We dnt hav a baby jstop txtn me and sendin me pics." Approximately twenty-four hours later, apparently in response to another text from Mother, Father texted this: "Go hav an abortion or sumthn get a life stop txtn me damn."[2] Although Father maintains he did not believe Mother when she told him that she was pregnant,[3] he did not undertake any effort to see her or otherwise confirm if she was, in fact, pregnant.

---

1. Father and Mother never lived together during their relationship or Mother's subsequent pregnancy.

2. Father stated in an affidavit to the family court that he offered to pay for an abortion.

3. During the course of their rocky relationship, Mother would use various excuses in an attempt to win Father back. For example, she

Shortly after receiving these initial text messages, Mother contacted an adoption agency about placing the child for adoption. She settled on Appellants as the prospective adoptive parents. From that point on, Appellants drove Mother to all of her remaining doctor appointments until the child was born. Additionally, Appellants made regular payments to the adoption agency for an allowance that was distributed to Mother for pregnancy and other miscellaneous expenses. However, Mother's medical expenses were covered by Medicaid. During the term of her pregnancy, Mother lived at home with her mother and other child. Her living expenses were covered by her mother and the food stamps they received, and were supplemented by the payments made by Appellants through the adoption agency.

Father soon learned of Mother's plans to place their child up for adoption. When he found out, he texted her: "If ur putn it w people and ur hapy then f*kn stop begin me 2 cum b there its not gna hapn." Less than a month later, he texted Mother: "Leav me tha f*k alone im nt gna txt u bak and I want nothng 2 do w u so jus get out mx [sic] life already." He made no further effort to inquire about Mother or their unborn child until November of that year when Mother visited Father at his workplace. According to Father, it was only at that time he realized she was indeed pregnant. It was then, some five or six months into Mother's pregnancy, that Father first informed Mother he wanted custody of the child and asked that she stop the adoption. At this point, Mother began having some reservations about whether to proceed with the adoption. She changed her mind about her decision several times and acknowledged that Father expressed at least some desire to raise the child, telling him that she would consider it "if he was serious." When Father asked if he could speak with Appellants about calling off the adoption, she refused to give him their names. However, Father claims Mother told him that he would be able to take the child home from the hospital when it was born.

---

told Father that her other son missed him, her cousin was in a car accident, and her grandfather was dying. Father therefore testified he initially believed Mother's pregnancy was another ruse to rekindle their relationship.

During the remainder of the pregnancy, Father bought some diapers for Mother's other son and made her a one-time offer of $100, which she refused. According to Father, Mother would not accept money for their child, but she would accept things for herself and her other son. In that vein, he paid eleven dollars for a T-shirt and sweat pants for Mother at Old Navy. He did not pay any medical expenses because Mother was receiving Medicaid, nor did he pay living expenses because Mother lived with her mother and received food stamps. He did gratuitously repair Mother's family vehicle, which was owned by her mother.[4]

At this time, Father earned nine dollars per hour plus average monthly commissions of $900 working at an auto parts store. He also had a second job performing automobile repossessions. However, very little of his commissions and none of his income from repossessions were reported on his financial declaration. He had $4,000 in savings[5] and $34,000 in property, which included several cars and motorcycles he planned to sell for cash. Although he appears to own most of his vehicles, his car payments totaled $500 per month, and he listed an additional $80 per month expense just for tires. Like Mother, Father lived at home with his parents. He anticipated that should he have custody of the child, it would stay with him at his parents' house. To that end, he converted some space in his parents' house into a nursery and purchased diapers, clothes, blankets, bottles, and other similar items.

After arranging the adoption, Mother had weekly meetings with the adoption agency to evaluate her progress. During one of these meetings in January 2009, Mother asked about Father's rights as the biological father of the child. One of the agency's employees told Mother what state law requires of a biological father and asked her whether Father had offered her any support. She told the employee of Father's one-time offer of $100, but said that he had made no other offers. The employee expressed her opinion that the offer was not legally sufficient to establish his rights as the father, but she told her

---

4.  Had this work been performed at an automobile repair shop, Father estimated it would have cost approximately $750.

5.  His savings were not reported on his financial declaration, but rather in the report from the guardian ad litem.

to let the agency know if he made any more offers. At no point did the agency advise her to not accept any offers from Father; in fact, the agency specifically told her to not hide from Father. Despite this, she told Father the agency told her to refuse his offers of support and that she should not even be speaking to him.

In March 2009, Mother gave birth to a baby boy. Appellants drove Mother to the hospital and spent the night with her there. Mother did not contact Father when she went into labor, but after their son was born she sent him a text message with a picture of the baby, stating that he was "with his parents," referring to Appellants. Father then went to the hospital to see Mother and the child, but hospital staff informed him that Mother was a "no information" patient and would not accept his visit. When Father attempted to get in touch with Mother, she lied and said she was at her father's house. The next day, Mother signed an adoption consent form, and Appellants took the child home.

Very soon thereafter, Father retained an attorney and moved for temporary emergency relief. The family court awarded Appellants temporary custody of the child. Once Father's paternity was established, the court awarded him weekly visitation and ordered him to pay child support.[6] During the period of time prior to the hearing on the issue of Father's consent to the adoption, Father exercised his right to visit the child, but he fell into arrears on his child support. In fact, it was not until the day before the consent hearing that this account was made current. At the hearing, Father testified that he "tried to be there" for Mother, but she refused his help and said he would never see his child. He also believed that Mother was jealous of his new relationship and did not want Father to raise the baby with another woman. On the other hand, Mother testified that she never believed Father was serious about raising their child and he "had his chance to step up . . . and he didn't." During the hearing, both Mother and Father acknowledged that they had not been truthful throughout these proceedings. Mother admitted she was untruthful to Father, Appellants, the adoption

---

6. Appellants refused to accept money from Father directly and requested that he pay the child support into the court.

agency, and the guardian ad litem; Father admitted he lied in his deposition to make his relationship with Mother appear more stable. The family court found that Father had undertaken sufficient prompt and good faith efforts to assume parental responsibility as required by section 63–9–310(A)(5)(b). Accordingly, the court found his consent was required for Appellants to adopt the child and ordered that the child be returned into Father's custody. This appeal followed.

## ISSUE PRESENTED

Did the family court err in finding Father was required to consent to the adoption of the child?

## STANDARD OF REVIEW

■ "[A]doptions are equitable proceedings, and therefore, the Court has jurisdiction to find facts in accordance with its view of the preponderance of the evidence." *Adoptive Parents v. Biological Parents*, 315 S.C. 535, 542 n. 6, 446 S.E.2d 404, 408 n. 6 (1994) (citing S.C. Const. art. 5, § 5). "This broad scope of review does not require the Court to disregard the findings of the family court judge, who saw and heard the witnesses and was in a better position to evaluate their credibility." *McCann v. Doe*, 377 S.C. 373, 382, 660 S.E.2d 500, 505 (2008).

## LAW/ANALYSIS

■ Appellants argue the family court erred in finding Father undertook a sufficient effort to assume parental responsibility. We agree.

■■ The relationship between an unwed father and his child is deserving of constitutional protection because the father possess an "opportunity no other male possesses to develop a relationship with his offspring" when the child is born. *Abernathy v. Baby Boy*, 313 S.C. 27, 31, 437 S.E.2d 25, 28 (1993).

However, this opportunity interest is constitutionally protected only to the extent that the biological father who claims protection wants to make the commitments and

perform the responsibilities that give rise to a developed relationship, because it is only the combination of biology and custodial responsibility that the Constitution ultimately protects.

*Id.* Put differently, it is only "[i]f he grasps that opportunity and accepts some measure of responsibility for the child's future [may he] enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." *Lehr v. Robertson,* 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Accordingly, section 63–9–310(A)(5)(b), provides,

> (A) Consent or relinquishment for the purpose of adoption is required of the following persons:
>
> . . . .
>
>> (5) the father of a child born when the father was not married to the child's mother, if the child was placed with the prospective adoptive parents six months or less after the child's birth, but *only if:*
>>
>> . . . .
>>
>> (b) the father *paid a fair and reasonable sum,* based on the father's financial ability, for the *support of the child* or for the expenses incurred *in connection with the mother's pregnancy or with the birth of the child,* including, but not limited to, medical, hospital, and nursing expenses.

(emphasis added). In enacting section 63–9–310(A)(5)(b), the General Assembly set the minimum standards an unwed father must meet in a timely fashion to "demonstrate his commitment to the child, and his desire to 'grasp [the] opportunity' to assume full responsibility for his child." [7] *Abernathy,* 313 S.C. at 32, 437 S.E.2d at 29 (quoting *Lehr,* 463 U.S. at 262, 103 S.Ct. 2985). An unwed father must therefore demonstrate a full commitment to the responsibilities of parenthood

---

7. Section 63–9–310(A)(5)(a) does not condition the necessity of the unwed Father's consent on financial contributions. That section provides his consent is required where he openly lived with the mother or the child for a period of at least six months immediately preceding the adoption *and* he openly held himself out as the child's father during this time. S.C.Code Ann. § 63–9–310(A)(5)(a). Because the child was placed with Appellants immediately after his birth and Father and Mother never lived together, this section does not apply.

by coming forward to participate in the rearing of his child in order for this relationship to obtain constitutional protection. *Id.* at 31, 437 S.E.2d at 28.

However, we do not always require strict compliance with the literal requirements of section 63–9–310(A)(5)(b). For example, a father's ability to cultivate the sort of relationship we recognized in *Abernathy* can be thwarted by the mother's refusal to accept the father's expressions of interest in and commitment to the child. *Id.* at 32, 437 S.E.2d at 29. We therefore extend the constitutional protection of a father's relationship with his child "not only when he meets the literal requirements of section 63–9–310(A)(5)(b), but also when he undertakes sufficient prompt and good faith efforts to assume parental responsibility and to comply with the statute." *Id.* Otherwise, a father's constitutional right to form a relationship with his child that receives constitutional protection is subject to the whim of the mother. *Id.* at 32–33, 437 S.E.2d at 29.

We begin our analysis by determining whether Mother thwarted Father's efforts to provide for her and their child in order to establish the proper standard under which we will evaluate Father's contributions. In the case before us, we find that Mother has not thwarted Father's attempts to form a relationship with their child as was the case in *Abernathy*. In *Abernathy*, both the mother and father of the child were on active duty in the Navy when they commenced a casual sexual relationship. *Id.* at 29, 437 S.E.2d at 27. In contrast to Father's actions here, when the mother, while she was on leave, informed the father by phone of her pregnancy, he begged her not to consider abortion, and she agreed. *Id.* When the mother returned, the father met her at the airport and offered to support her and the child. *Id.* The mother told him they would discuss the situation when he returned from sea duty; nevertheless, when the father shipped out, he turned over his car and his bank account to the mother. *Id.* While the father was at sea, the mother determined she desired no further involvement with him. *Id.* When he returned, she rebuffed his advances and rejected his offer of marriage. *Id.* She thereafter avoided contact with him, refused his telephone calls, and basically hid away from him. *Id.* When the father later learned of the birth and the pending adoption action, he sought to intervene and assert his

parental rights. *Id.* at 30, 437 S.E.2d at 27. Under these compelling facts, this Court rightly concluded that literal compliance with the predecessor to section 63–9–310(A)(5)(b) was not necessary. *Id.* at 32–33, 437 S.E.2d at 29.

The facts of this case bear little resemblance to those presented in *Abernathy*. Here, Father not only advised Mother to have an abortion and stop bothering him when he was initially told of her pregnancy, he also told her several weeks later that if she was happy with giving up the baby for adoption, that was fine with him. It was when Mother was five or six months into her pregnancy and went to visit Father that he told her he wanted to raise the child, and he claims Mother told him that when the child was born, he would be able to take him home from the hospital. It was not until the child was born that Mother prevented Father from seeing the child and went through with the adoption. During her entire pregnancy, the only support Mother refused was Father's one-time offer of $100. Beyond that, the record contains no evidence Mother actually hid herself from Father or refused his assistance. If this is sufficient to constitute thwarting, the exception to literal compliance with the requirements of section 63–9–310(A)(5)(b) has swallowed up the rule.

The situation before us therefore falls far short of the extraordinary factual scenario presented in *Abernathy* which prompted this Court to require less than literal compliance with the statutory provision in question.[8] Given that Father was an adult at the time this child was conceived, we are not persuaded he would have been so easily thwarted in his efforts to assume his parental responsibilities by this sixteen-year-old girl who did not hide from him as in *Abernathy*, but continued to live in the same house throughout her pregnancy and delivery. The Court of Appeals of Kansas summed up an unwed father's obligation as follows:

He must [provide support] regardless of whether his relationship with the mother-to-be continues or ends. He must

---

8. Even if we were to agree with the dissent that the father in *Doe v. Queen*, 347 S.C. 4, 552 S.E.2d 761 (2001), did less to assume parental responsibility than Father in this case, the dissent loses sight of the fact that the father in *Queen* was thwarted and was held to a lower standard. Because Father here was not thwarted, he must literally comply with the statute.

do this regardless of whether the mother-to-be is willing to have any type of contact with him whatsoever or to submit to his emotional or physical control in any way. . . .

Even in the most acrimonious of situations, a father-to-be can fund a bank account in the mother-to-be's name. He can have property or money delivered to the mother-to-be by a neutral third party. He can—and must—be as creative as necessary in providing *material assistance* to the mother-to-be during the pregnancy and, the law thus assumes, to the child once it is born. He must not be deterred by the mother-to-be's lack of romantic interest in him, even by her outright hostility. If she justifiably or unjustifiably wants him to stay away, he must respect her wishes but be sure that his support does not remain equally distant.

*In re Adoption of M.D.K.*, 30 Kan.App.2d 1176, 58 P.3d 745, 750–51 (2002) (Beier, J., concurring) (emphasis added). The thwarting recognized by this Court in *Abernathy* is far more severe than that referenced in the above-quoted passage from *Adoption of M.D.K.* In order for an unwed father to be thwarted, the mother must be more than acrimonious or hostile; she must actively hide and avoid the father's attempts to provide support. However, the situation before us today is more akin to that referenced in *Adoption of M.D.K.*, not what occurred in *Abernathy.* Accordingly, Mother did not sufficiently thwart Father's efforts to establish a relationship with his child such that literal compliance with section 63–9–310(A)(5)(b) is excused.

We turn now to whether Father has complied with the statutory requirements. Section 63–9–310(A)(5)(b) clearly "conditions the necessity of a father's acquiescence in an adoption on his payment of support or financial assistance to the birth mother." *Ex parte Black,* 330 S.C. 431, 435, 499 S.E.2d 229, 231 (Ct.App.1998). It is not enough that the father simply have a desire to raise the child; he must act on that interest and make the material contributions to the child and the mother during her pregnancy required of a father-to-be. Accordingly, a father's attempts to assert his parental rights are insufficient to protect his relationship with the minor child "unless accompanied by a *prompt, good-faith effort* to assume responsibility for either a financial contribution to

the child's welfare or assistance in paying for the birth mother's pregnancy or childbirth expenses." *Id.* (emphasis added). According to Father, it was only when Mother appeared at his place of work in November 2008 that he realized she was indeed pregnant; moreover, he then ostensibly realized that she had not followed his advice to have an abortion. However, even assuming *arguendo* that Father's initial responses to news of Mother's pregnancy and her decision to place the child for adoption were excusable, his actions to assume parental responsibility beginning in November 2008 were still insufficient to require his consent under our adoption statute. Even taking Father's testimony as true, we find that he did not pay "a fair and reasonable sum … for the support of the child or for expenses incurred in connection with the mother's pregnancy or with the birth of the child."

First, Father's payments and purchases for Mother's older child and the repairs made to her mother's car are not within the purview of section 63–9–310(A)(5)(b). Payments made to other children in the family or repairs to the vehicle of the grandmother, which was not a necessary support for the pregnancy because the adoptive parents drove Mother to her doctor appointments, are not embraced by the statute and should not be considered. Furthermore, Father's actions in setting up a nursery at his parents' home—when the child already had a place to sleep at Mother's should he not reside with Appellants—and legal fees he incurred to challenge the adoption likewise are not valid considerations under the statute. Similar to the payments for Mother's older child and the repairs to her mother's vehicle, these expenditures are not for "the support of the minor child" or "expenses incurred in connection with mother's pregnancy or with the birth of the child" as required by section 63–9–310(A)(5)(b).

Father testified he paid eleven dollars for a T-shirt and sweatpants for Mother. This single payment represents the sole expenditure by Father which complies with section 63–9–310(A)(5)(b), assuming these clothing items were related to the pregnancy. He paid no medical expenses for Mother because she was on Medicaid, and did not pay any living expenses because Mother lived with her mother and received food stamps. However, this does not excuse Father from contributing more than eleven dollars towards Mother's pregnancy.

Simply because she was receiving some government benefits to cover her basic needs does not relieve Father of his obligation to provide for Mother during her pregnancy. Indeed, Appellants contributed regularly to Mother during her pregnancy despite the availability of these benefits. Even if Mother had accepted Father's offer of $100, the resulting $111 contribution would still be inadequate, especially in light of the money Father spent on himself during Mother's pregnancy; the payments Father made for tires on his car alone far exceeded that amount.

The record does not support the conclusion that Father undertook a sufficient effort to make the sacrifices fatherhood demands. Father had the means and opportunity to provide more, but he simply chose not to and to rely on others to provide for Mother. Even though she rebuked some of his efforts, that did not alleviate or in any way mitigate his obligation. *See Adoption of M.D.K.,* 58 P.3d at 750–51 (Beier, J., concurring). The fact that he now wishes to raise his son does not overcome his lack of support and contribution while Mother was carrying his child or after he was born. In short, he did not fully "grasp [the] opportunity" to come forward and demonstrate a full commitment to the responsibilities of parenthood through prompt and good faith efforts. We accordingly hold that Father's contributions were not sufficient compliance with the statute to establish his right to consent to the adoption of this minor child.[9] Although we are not unmindful of the findings of the learned and able family judge in this case, our review of the record compels us to find that Father has not met the requirements imposed by section 63–9–310(A)(5)(b).

## CONCLUSION

For the foregoing reasons, we reverse the order of the family court requiring Father's consent to the adoption of this

---

9. Father argues that his payment of child support per the family court's order is per se reasonable under the statute. Father's argument ignores that he understated his income on his financial declarations and was in arrears on the payments until the day before the hearing. We therefore decline to reach whether, in a proper case, payment of child support is per se reasonable.

child. Appellants are to obtain immediate custody of the child.

TOAL, C.J. and KITTREDGE, J., concur. PLEICONES, J., dissenting in a separate opinion in which BEATTY, J., concurs.

Justice PLEICONES.

I respectfully dissent. In my opinion, the family court correctly determined Father's consent was required for the adoption of the child because Father demonstrated sufficient and prompt good faith efforts to assume parental responsibility such that his literal compliance with § 63–9–310(A)(5)(b) should be excused.

In appeals concerning adoption proceedings, as in any appeal from family court, this Court may find the facts in accordance with its own view of the preponderance of the evidence. *McCann v. Doe*, 377 S.C. 373, 382, 660 S.E.2d 500, 505 (2008). This broad scope of review does not require the Court to disregard the findings of the family court judge, who saw and heard the witnesses and was in a better position to evaluate their credibility. *Id.*

I disagree with the majority's conclusion that Mother did not thwart Father's attempts to form a relationship with the child because she did not actually hide herself and the only financial support she rejected was Father's "one-time offer of $100." In my opinion, the family court correctly found Mother thwarted Father's attempts to provide financial support based on the adoption agency's advice about birth father's rights. The majority states Father made Mother a one-time offer of $100, which she refused. Father's testimony, however, contradicted this. Father testified he offered Mother money "a lot" but that Mother told him the agency advised her not to accept any offers of support or even speak to him. Father testified Mother would accept money for herself and her other son but wouldn't accept anything "immediately for [the child]." After assessing the credibility of the witnesses, the family court found Mother refused Father's offers of support based on the agency's advice about birth father's rights. Although we may find the facts in accordance with our own view of the preponderance of the evidence, we are not required to disregard the

findings of the family court, who saw and heard the witnesses and was in a better position to evaluate their credibility.

Further, the majority focuses solely on the financial considerations that are to be made in determining whether a father's consent is required. In doing so, the majority fails to recognize Father's offers of non-financial support. "The United States Supreme Court has recognized that an unwed father may possess a relationship with his child that is entitled to constitutional protection." *Abernathy* at 31, 437 S.E.2d at 28 (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). However, "parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Id.* (quoting *Lehr v. Robertson*, 463 U.S. 248, 260, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)). Thus, an unwed father must demonstrate a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child before his interest in personal contact with his child acquires substantial constitutional protection. *Id.* The mere existence of a biological link does not merit equivalent constitutional protection. *Id.*

In my view, the constitutional protection afforded Father by virtue of his demonstrated commitment to the child far outweighs his failure to literally comply with the requirements of the statute. The majority states the facts favorable to Father in this case do not rise to the level of those in *Abernathy*. The *Abernathy* Court considered not only father's offers of financial support, but also took into account the fact that father did not seek legal advice about how to protect his paternal interests because of mother's assurance that she would not place the child for adoption. *Abernathy* at 33, 437 S.E.2d at 29. The Court also noted the father "immediately manifested his willingness to assume sole custody of the child once he discovered adoption proceedings had commenced." *Id.*

Turning to the facts of the present case, once Father realized Mother was actually pregnant, he immediately manifested his willingness to raise the child. Father pleaded with Mother to stop the adoption process, even offering to call Appellants to discuss the matter. Father also relied on Mother's misrepresentations to him on several occasions that

she would not go through with the adoption. In fact, Father believed he would be able to take the child home from the hospital after its birth. The record also clearly shows that Mother used the adoption process as leverage to try to lure Father back.

The majority focuses on distinguishing the facts of the present case from the "extraordinary factual scenario" presented in *Abernathy*. Although *Abernathy* is the seminal case on this issue, it is not the only case where the Court has determined a father was not required to literally comply with the statute. In *Doe v. Queen*, 347 S.C. 4, 552 S.E.2d 761 (2001), the factual scenario presented certainly did not reach that of *Abernathy*. We nonetheless affirmed the family court's ruling that the father demonstrated sufficient prompt and good faith efforts to assume parental responsibility such that his literal compliance with the statute was excused. In that case, the mother lied to the father and told him she had an abortion after he tried to convince her to keep the child. *Queen* at 6, 552 S.E.2d at 762. The mother also signed a criminal warrant against the father, which resulted in a bond condition that father have no contact with the mother. *Id.* The father was notified of the child's birth in November, approximately two months after the child was born. *Id.* When the adoptive parents requested the father sign the consent forms, the father obtained an attorney, but did not file responsive pleadings until the day of the hearing the next August. *Id.* The father began saving money, prepared a nursery, and arranged for medical insurance for the child. *Id.* We found the father's failure to provide support during the mother's pregnancy was no fault of his own, and that the father's actions subsequent to learning of the child's birth demonstrated sufficient prompt and good faith efforts to assume parental responsibility. *Queen* at 9, 552 S.E.2d at 764. If the father's actions in *Queen* constituted sufficient prompt and good faith efforts to assume parental responsibility, then Father has surely exceeded that standard here. In my view, the father in *Queen* did very little to support his child after learning of its birth. Here, Father exercised regular visitation and paid child support, in addition to preparing a nursery.

Moreover, in focusing on distinguishing the present case from *Abernathy*, the majority fails to recognize the numerous

cases in our jurisprudence where our courts have determined the father's consent was not required. These cases are, in my opinion, instructive owing to their contrast with the factual scenario under consideration. *See Doe v. Roe*, 369 S.C. 351, 631 S.E.2d 317 (Ct.App.2006) (father's contributions to mother were insubstantial and inconsistent, mother never refused father's help but, rather, requested it, mother attempted to reach father on several occasions but he avoided her); *Arscott v. Bacon*, 351 S.C. 44, 567 S.E.2d 898 (Ct.App.2002) (mother informed father she had given birth, and even with this direct information from mother, father still did not believe that she had ever been pregnant and had given birth, and father did nothing, despite knowing that mother had a child and he could be the father); *Parag v. Baby Boy Lovin*, 333 S.C. 221, 508 S.E.2d 590 (Ct.App.1998) (father could have sought the exact location of his child and could have made efforts to cultivate a relationship with the child three months prior to taking any action; father never offered any financial support to mother in connection with the expenses of her pregnancy and birth; and father never offered any financial support for the child after learning of his birth); and *Ex parte Black*, 330 S.C. 431, 499 S.E.2d 229 (Ct.App.1998) (assuming unwed father took prompt measures to determine paternity and assert parental rights after biological mother informed father of child's existence, where father failed to offer to support child or assist in medical expenses, his consent to adoption was not required).

In my opinion, the present case is distinguishable from those cases in which our courts have determined a father's consent was not required. Mother never requested assistance from Father, but rather, told him she did not want to "mess up the adoption" by accepting money from him. After the child's birth, Father showed his commitment to the child by immediately moving for temporary relief, preparing a nursery, regularly exercising his visitation rights, and paying child support. Father also offered to reimburse Appellants for all of their expenses incurred during Mother's pregnancy.

In my opinion, Father timely demonstrated his willingness to develop a relationship with his child and therefore acquired constitutional protection. I would therefore affirm the family

court's finding that Father's consent was required and find that custody of the child should remain with the Father.

BEATTY, J., concurs.